515 So.2d 1196 (1987)
Thomasina BLISSARD, Frances B. Boeckman, Jo Ann Blissard Bomar, James Claude Hightower, III, and Mary Lynn Hightower Spears
v.
Estate of Thera B. WHITE, Deceased.
No. 57287.
Supreme Court of Mississippi.
November 25, 1987.
*1197 Ralph E. Rood, Gholson, Hicks & Nichols, Columbus, for appellant.
Kenneth M. Burns, Okolona, for appellee.
Before ROY NOBLE LEE, C.J. and ROBERTSON and GRIFFIN, JJ.
ROBERTSON, Justice, for the Court:

I.
This is a confidential relationship/undue influence case arising out of a squabble between family members because the oldest sister's will favored baby brother. Five nieces and nephews mount the challenge. The Chancery Court held the testatrix competent and that her will was not procured by undue influence. Accepting established limitations upon our scope of review, we affirm.

II.

A.
Thera B. White died on June 6, 1984, at the age of ninety-one. Her heirs-at-law consisted of two brothers and two sisters as well as the children of two deceased sisters and one deceased brother. However, the will contested here left her estate to one of her brothers, Dwight Blissard (now approximately 78 years old).
The spurned nieces and nephews are: Dr. Thomasina Blissard, Francis B. Boeckman and Jo Ann Blissard Bomar, the children of Thera's deceased brother; Thomas L. Blissard, deceased; and James Claud Hightower, III, and Mary Hightower Spears, the children of Thera's deceased sister; Jimmie Grace Blissard. These five are the will's contestants.
Thera's husband, Campbell, had died in 1964, and Thera went to live with her spinster sister Gladys in Okolona. Dwight lived with his wife about a mile away and, as Thera did not drive, did much of the "leg work" for Thera when Gladys was not available. Dwight visited his sisters about once a week unless they needed him more often. He also took them to Florida once, and to Birmingham two times to see their brother. In 1980, Thera paid one-half of the price of a Toyota she and Dwight purchased and put in his name.
In September of 1974, Thera executed a general power of attorney empowering *1198 Dwight to act on her behalf. She did this, Dwight testified, because a brother of theirs had just died of a stroke and they had had a grandmother who was an invalid for years because of a stroke. Incapacity from stroke was something they all feared, and Thera made out the power of attorney so that Dwight could help her in that event. It was Thera, who came up with the idea, and Dwight was not present when she signed the power of attorney. Dwight used the power of attorney only to do what his sister desired him to do.
After receiving the power of attorney, Dwight became the only one to enter Thera's lock box. For consideration of $10.00 in cash, Thera conveyed her undivided five-eighths interest in the family estate to Dwight, reserving only a life estate for herself. In May of 1975, Thera was told by John Sibley, Esq., of Okolona, the lawyer who had prepared the deed that a correction deed was needed, and Sibley took care of that.
In March of 1977, Thera made out her will. Dwight testified that he was first aware of it when she handed it to him and told him to put it in the lock box. Prior to making the will, however, Thera deeded her house to Gladys.
Dwight's name was on Thera's certificates of deposit as well as her checking account. Dwight testified that Thera had wanted his name on them and that he regularly deposited her money for her, wrote checks on her account to pay her bills, and placed the CDs where they could earn the highest interest  all at Thera's request.
Dwight maintained that he and his eldest sister had always been close. When Dwight was born, his mother was ill and Thera fed him and took care of him. She was his first teacher. So, when "it was my time to help take care of her... . I would have done anything she asked me to do."
Thera was in a nursing home twice for a total of a year and a half (once because of a broken hip and then for six months prior to her death). But Thera was mentally fit all of her life and quite physically capable when she made out her will in 1977.
John Sibley, the lawyer who prepared the various documents, testified that, when Thera signed the power of attorney, there was no one in the office with her, and she fully understood what she was doing. "In my opinion [she was] fully in charge of her faculties," Sibley testified.
At the time the will was made, "we went over everything I thought was relevant to discuss with her," Sibley said. Even though Sibley had prepared some documents for Dwight (a deed when Dwight sold a theater as well as wills for Dwight and his wife), he did not feel it necessary to advise Thera to discuss the will with someone else. "Mr. Blissard never had me under a retainer. Mr. Blissard had no business pending in my office at that time. I had no relationship with Mr. Blissard that would color my testimony or my advice to Mrs. White in any way," Sibley stated.
Thera was accompanied by no one when discussing the will. She paid Sibley for his services. She understood that she was excluding her other relatives but "she was doing what she wanted to do with it," Sibley testified. When Sibley asked her if she wanted to leave everything to Dwight, she said she had already taken Gladys into consideration in deeding her the house and she indicated she had a particular fondness for Dwight. Sibley added that whenever he saw Thera she was very alert and he was not aware of any mental or emotional incapacity.
Two of Thera's neighbors testified that she was a very able lady  both physically and mentally. They would see her when the weather was nice tending to her flowers.
Further evidence of Thera's independence and competence came from the certified public accountant who had prepared her tax returns since 1968. James Lee Stafford testified that Thera was quite meticulous in her record keeping. Thera had to prepare quarterly estimates of her income for the IRS and Stafford stated that she always had them done on time. She seemed fully aware of her business affairs  her estate was worth around $200,000.00 in cash  but Thera never discussed with Stafford where she desired her money to go upon her death.
*1199 Three of Thera's nieces testified that they had remained close to Thera and one of them would visit every two or three months after Thera's husband died. Usually, whenever one of them visited, Dwight and his wife would show up. Jo Ann Blissard Bomar testified that Thera paid her daughter's way to England one year. Thomasina Blissard stated that Thera and Campbell White were generous in helping her return to school to study medicine. Thomasina recalled that Dwight had called her once worrying because a needy relative had contacted Thera for help and Thera had sent $800.00 but forgot and sent another $800.00 and then another. "I agreed with him that this was disturbing  he said that he must do something about that ... and he went on to say that he felt that he would have to put a limit of $100.00 on the checks that she could  could write." Thomasina also recalled the time when Dwight brought Thera to a hospital in Jackson. "My brother-in-law was there and was helping her  push her in the wheelchair ... and Dwight objected to this. He pushed in  didn't  didn't want anybody else helping her, pushing her. He said, `I'll take care of this.'"

B.
This will contest began on October 19, 1984, when Thomasina Blissard, Frances B. Boeckman, Jo Ann Blissard Bomar, James Claude Hightower, III, and Mary Lynn Hightower Spears filed their complaint in the Chancery Court of Chickasaw County. They charged that the executor and sole beneficiary under the will, Dwight Blissard, occupied a confidential relationship with the deceased at the time the will was made and that Dwight had unduly influenced Thera to leave her estate to him. On November 15, 1985, a judgment was filed dismissing the complaint for the reason that Dwight Blissard had overcome the presumption of undue influence. From this judgment, the Plaintiffs/Contestants appeal, assigning as error the following:
(1) The chancellor was manifestly in error in finding that the proponent of the will overcame the presumption of undue influence by clear and convincing evidence.
(2) The chancellor was manifestly in error in creating and applying a separate standard than would be applied to any other advisor for a "country lawyer" in determining whether or not the testatrix received the advice of a competent person separate and apart from the beneficiary and wholly devoted to her interests.

III.
We begin with our scope of review. This Court will not reverse a chancery court's findings of fact where they are supported by substantial, credible evidence in the record. Anderson v. Burt, 507 So.2d 32, 36 (Miss. 1987); Norris v. Norris, 498 So.2d 809, 814 (Miss. 1986); and Culbreath v. Johnson, 427 So.2d 705, 707-09 (Miss. 1983). This is as true of ultimate facts as of evidentiary facts. Norris, 498 So.2d at 814; Spain v. Holland, 483 So.2d 318, 320 (Miss. 1986); and Cheek v. Ricker, 431 So.2d 1139, 1143 (Miss. 1983). In other words, this Court ought and generally will affirm a trial court sitting without a jury on questions of fact unless, based on substantial evidence, the court be manifestly wrong. UHS-Qualicare, Inc. v. Gulf Coast Community Hospital, Inc. (Miss. No. 56,389, dec. August 26, 1987) (not yet reported); Brown v. Williams, et al., 504 So.2d 1188, 1192 (Miss. 1987); Will of Polk, 497 So.2d 815, 818 (Miss. 1986). And, finally, the trial court, sitting in a bench trial as the trier of fact, has sole authority for determining the credibility of the witnesses. Hall v. State ex rel. Waller, 247 Miss. 896, 903, 157 So.2d 781, 784 (1963).

IV.
The Chancery Court held that Dwight Blissard's relationship with his older sister was such that he owed her the duties of a fiduciary. One of the factors undergirding that finding of ultimate fact was the power of attorney Dwight held from Thera. See Costello v. Hall, 506 So.2d 293, 296-97 (Miss. 1987). Thus was generated a rebuttable presumption that the bequest in Thera's will was procured by Dwight taking unfair advantage of the position of trust and influence he occupied. *1200 The Chancery Court, however, held that Dwight had overcome the presumption and by clear and convincing evidence.
This case is controlled by Mullins v. Ratcliff, 515 So.2d 1183, 1193 (Miss. 1987). In Mullins we declared that, before a bequest such as that here will be enforced, the legatee, Dwight, must show (1) his good faith; (2) the testatrix' full knowledge and deliberation of her actions and their consequences; and (3) the testatrix' independent consent and action.
No serious doubts appear of Dwight's good faith. The evidence shows that Thera White was a strong willed and capable woman who was in charge of her financial affairs with only "leg work" aid from her brother. John Sibley's testimony is quite convincing that Thera, in willing her estate to her brother, was doing exactly what she desired to do. Sibley was competent to render independent advice despite the fact he had done legal work for Dwight (preparing a deed and two wills). We are not concerned with Sibley's independence so much as with Thera's, of which there is evidence in abundance. Indeed, were we to disqualify Sibley's advice, we would create a trap which would void bona fide gifts and bequests among family members in small towns and rural areas all over this state.
Having in mind the Mullins test and as well our limited scope of review, we find that the record contains evidence of sufficient quality and quantity that a rational trier of fact could have concluded that Dwight had proved by clear and convincing evidence that Thera's will was not procured through the exercise of undue influence.
AFFIRMED.
ROY NOBLE LEE, C.J. and PRATHER, SULLIVAN, ANDERSON, GRIFFIN and ZUCCARO, JJ., concur.
HAWKINS and DAN M. LEE, P.JJ., not participating.