516 So.2d 1359 (1987)
In the Matter of the ESTATE OF Bertha O. Haney, Deceased.
Janie Haney AUSTIN
v.
Dewey Jack HANEY.
No. 57375.
Supreme Court of Mississippi.
December 16, 1987.
Gary Street Goodwin, Beverley Mitchell Franklin, Columbus, for appellant.
William Liston, Jessica S. Upshaw, Liston, Gibson & Lancaster, Winona, for appellee.
Before ROY NOBLE LEE, C.J., and ANDERSON and ZUCCARO, JJ.
ZUCCARO, Justice, for the Court:
Dewey Jack Haney petitioned the Chancery Court of Webster County to admit to probate in common form the will of Bertha O. Haney. Janie Haney Austin filed a caveat contesting the will. After a bench trial, the chancellor found the will to be valid and entered judgment in favor of the proponent. From that judgment Janie Haney Austin appeals, claiming that the chancellor was manifestly wrong in finding that the presumption of undue influence arising from the confidential relationship between the proponent and the testator was rebutted.
Bertha O. Haney (Bertha), an elderly woman,[1] executed her will on January 8, 1982, leaving everything to her grandson Dewey Jack Haney (Jack) and thereby excluding her only other heir presumptive, her granddaughter Janie Haney Austin (Janie). In challenging the will, Janie offered evidence of several factual incidents which, she claimed, established the existence of a confidential relationship between Bertha and Jack. Jack then offered evidence to overcome the presumption. We address these two (2) aspects of the evidence separately.

*1360 JANIE'S EVIDENCE TENDING TO ESTABLISH CONFIDENTIAL RELATIONSHIP AND UNDUE INFLUENCE
Some of Janie's evidence was very general. For example, she attempted to show that Bertha had always relied on men to tell her what to do  first her husband, then her son, and finally her grandson Jack. Janie also put on medical evidence indicating that Bertha was in ill health and had to be hospitalized several times beginning in 1977 and ending with her death in 1983. Bertha's health problems included strokes, diabetes, hypertension, and other conditions.
Janie also offered into evidence several warranty deeds by which Bertha, over the last few years of her life, transferred most of her real property to Jack. Janie and her mother both testified that Jack had stated, before Bertha's death, that he would eventually own all of Bertha's property. In addition, Janie testified that Bertha had told her, "When I die, Jackie has said he will divide things properly," and Janie's mother testified that Jack stated his intent to see to it that Janie did not get anything.
The most troubling evidence put on by Janie was testimony regarding two (2) statements allegedly made by Bertha. First, Bertha's sister-in-law testified that Bertha told her Jack had made her make an ass of herself by getting her to sign over to him everything she owned. There are at least two (2) documents to which this statement could have referred: 1) the January 2, 1982, deed by which Bertha conveyed her residence to Jack; or 2) Bertha's will, executed January 8, 1982, in which she left everything to Jack. Asked when Bertha made this statement, the sister-in-law replied that it was "around January 2 or sometime right after the deed had been fixed."
Similarly troubling is testimony indicating that after executing her will, Bertha stated her desire to change it, but was told by Jack and by the lawyer who prepared the will that she would have to go to court in order to do so. Because she was very ill and was in the nursing home, Bertha thought going to court would be impossible. Both Bertha's sister-in-law and Janie's mother testified to this alleged occurrence. Although the lawyer who prepared the will testified at trial, he was not questioned about this incident.
Bertha's sister-in-law also testified that "Jackie could soft-pedal [Bertha] and get her to do most anything he wanted to do," but admitted that "if she wanted not to do something, she wouldn't do it, regardless of what he said."

JACK'S EVIDENCE TENDING TO REBUT THE PRESUMPTION
The trial court, in its opinion, did not expressly find that a confidential relationship existed. Thus, we are unable to determine whether the trial court's judgment for Jack was based on 1) a finding that there was no confidential relationship, or 2) a finding that although there was a confidential relationship, the presumption of undue influence arising therefrom was overcome. A copy of the trial court's opinion is attached to this opinion as Appendix A.
In any event, Jack did put on evidence in an attempt to overcome the presumption, if any.
Pete Fortner, the attorney who drafted Bertha's will, testified as follows. He began doing legal work for Bertha in the late 1970's. At the time Bertha's will was executed, Fortner was not representing Jack in any capacity. Bertha's great-grandson (Jack's son) drove her to Fortner's office the day the will was drafted, and Jack drove her back a few days later when she signed it, although Jack waited in Fortner's outer office. Fortner discussed with Bertha the amount of property she had and what she wanted done with it. When Fortner pointed out to Bertha that she was not including all her family, she replied, "Yes I know that. I wanted all of it to go to Jackie because he is the one that's cared for me and interested in me, and he is the only one I want any property to go to." Bertha paid Fortner $20.00 for drafting the will. Before Bertha signed the will, Fortner read it to her line by line and inquired whether the document was what she wanted, to which she replied affirmatively.
Jack also put on evidence tending to show that Bertha was strong-willed and that she thought for herself. For instance, just a few days before executing the will, Bertha by herself bargained for and bought a home.
Also, Jack elicited from Bertha's sister-in-law evidence indicating that the reason Bertha wanted to change her will was that she was dissatisfied with Jack's refusal to quit his job in order to stay with her full-time.
The task at hand is to apply to these facts the law regarding confidential relationships. *1361 A confidential relationship does not have to be a legal one, but may be moral, domestic, or personal. Hendricks v. James, 421 So.2d 1031 (Miss. 1982). The relationship arises when a dominant, overmastering influence controls over a dependent person or trust, justifiably reposed. Hendricks, 421 So.2d at 1041. Before the presumption arises, there must be an abuse of the confidential relationship, and that abuse must relate to the execution of the will. Costello v. Hall, 506 So.2d 293 (Miss. 1987).
If the chancellor did find there was no confidential relationship (there is no express finding in the record), he would not be, based on the evidence summarized above, manifestly wrong, and therefore any such finding would be beyond our authority to disturb. Brown v. Williams, 504 So.2d 1188 (Miss. 1987). Moreover, even if this Court were to find that the presumption arose, the record supports a finding that Jack overcame the presumption. In Murray v. Laird, 446 So.2d 575 (Miss. 1984), this Court enumerated what the proponent must prove in order to overcome the presumption:
1) good faith on the part of the grantee/beneficiary;
2) grantor's full knowledge and deliberation of his actions and their consequences; and
3) advice of a competent person, disconnected from the grantee, and devoted wholly to the grantor/testator's interest.
Id. at 578.
More recently we redefined this third prong as requiring a showing of independent consent and action. Mullins v. Ratcliff, 515 So.2d 1183, (Miss. 1987). We also held that the three (3) prongs of the Murray test "should not be understood as entirely separate and independent requirements that ought to be rigidly exacted in every case [since] ... [u]ndue influence is a practical, non-technical conception, a common sense notion of human behavior." Mullins at 1194. See also, Blissard v. Estate of White, 515 So.2d 1196 (Miss. 1987).
The evidence in the instant case is conflicting. The chancellor resolved those conflicts in favor of Jack; in so doing he was not manifestly wrong. Applying the practical, common sense, non-technical test described in Mullins, we cannot say that the trial court erred by ruling in Jack's favor. The judgment is affirmed.
AFFIRMED.
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.JJ., and PRATHER, ROBERTSON, SULLIVAN, ANDERSON and GRIFFIN, JJ., concur.

APPENDIX A

IN THE MATTER OF THE ESTATE OF BERTHA O.

HANEY, DECEASED

DEWEY JACK HANEY, EXECUTOR

JANIE HANEY AUSTIN, CONTESTANT,

VERSUS

DEWEY JACK HANEY, PROPONENT.

IN THE CHANCERY COURT OF WEBSTER COUNTY, MISSISSIPPI

NO. 8361

OPINION OF THE COURT
By stipulation and agreement of counsel for the parties, Exhibits 7, 8, 9, 10, and 11 have been received into evidence; and, therefore, a finding of fact is deemed unnecessary outlining the probate of subject will.
At the time of her death on June 11, 1983, Mrs. Bertha O. Haney was eighty-six *1362 years of age and a resident citizen of Webster County, Mississippi. On July 7, 1983, an instrument dated January 8, 1982, and purporting to be the Last Will and Testament of Bertha O. Haney, deceased, was duly admitted to probate in common form by the clerk of this Court. The summons subsequently issued and served is considered to have been surplusage and of no consequence.
The parties hereto  Janie Haney Austin, hereinafter contestant, and Dewey Jack Haney, hereinafter proponent  are the only grandchildren and are the sole surviving heirs-at-law of Bertha O. Haney, hereinafter decedent.
The contestant filed a Caveat alleging, among other things, that the instrument admitted to probate was not the true last will and testament of Bertha O. Haney, deceased, for the reasons that
(a) at the time of the execution of the instrument, namely January 8, 1982, Bertha O. Haney did not have the mental capacity necessary to the execution of a will and was not of sound and disposing mind and memory and the decedent was not sufficiently sound of mind to enable her to know and to understand her acts and was, in fact, mentally incapacitated from making a will for a proper distribution of her property;
(b) the instrument was not executed in accordance with the statutes of the State of Mississippi prescribing the essentials of a will;
(c) the decedent was coerced and induced into signing the instrument by undue influence of Dewey Jack Haney who occupied a fiduciary relationship with the decedent prior to and at the time of the execution of the instrument; and
(d) the instrument was obtained from the decedent by Dewey Jack Haney through fraud and misrepresentation.
The contestant offered no proof in support of her allegations contained in Items A, B, and D. In fact, the contestant, on cross examination, admitted that she never made any allegations questioning her grandmother's  the decedent  mental capacity. She further acknowledged that the decedent was in control of her mental faculties during Thanksgiving and Christmas of 1981 and, further, very much in control in that she made the decision to move from Mathiston into a house that she pruchased in Eupora, all in late December, 1981, and early January, 1982. Therefore, the only issue to be decided by Court is Item (c), which is whether or not "the decedent was coerced and induced into signing the instrument by undue influence of Dewey Jack Haney who occupied a fiduciary relationship with the decedent prior to and at the time of the execution of the instrument."
Although the decedent had a long history of physical infirmities related to diabetes, hypertension and arteriosclerosis, at no time by her attending physicians was she ever prescribed or given any medication that would affect her mentally or be of any mind-altering consequences. According to Dr. Charles Ozborn, who was her attending physician for more than five years preceding the date of death, not until she suffered a stroke on March 21, 1983, did she become confused and demented.
The testimony is undisputed in that the decedent never learned to drive an automobile and did require assistance from others for transportation; that she was a very capable business woman and did manage and handle her own affairs. The decedent had been married (her husband having predeceased her); and to their union were born three children, all who predeceased her. Her sole surviving heirs-at-law are her two grandchildren, the contestant and proponent herein. She and her husband had acquired, owned, and operated farm land, timber land, rental buildings, and a dry cleaning establishment.
It is of no little import to the issue before the Court, and should be herein noted, the parties hereto were previously involved in litigation concerning the properties of this estate. In 1968 Mrs. Lorene Haney, the decedent's daughter-in-law, and mother of *1363 the contestant and proponent, together with the contestant and proponent, initiated action opposing the interest of the decedent and her son, John. If there be one thing that is abundantly clear, it is that the relationship between brother and sister and mother is anything but cordial except between mother and daughter. Apparently, until 1976, neither of the parties were called upon or provided any particular assistance because the decedent's son John, lived with her, and she relied upon him. Following John Haney's death in 1976, and until the decedent's death in 1983, the proponent and members of his family visited her daily and rendered whatever assistance she requested including, but not being limited to, transportation. Unquestionably, a close family relation developed between grandmother and grandson. Not only did the decedent have the proponent's name added to and thereby creating with her joint bank accounts, she paid off the mortgage on his home, she purchased for him automobiles, boats, and furniture, and, over a five-year period, she conveyed to him title to all of her real estate.
Under the case law of our state, the existence of a confidential or fiduciary relationship gives rise to a presumption of undue influence. Throughout her life, the decedent required assistance of transportation in conducting business, first her husband, then her son John, and finally her grandson Jackie, the proponent herein. Our case law further provides that the proof of the confidential relationship proves the undue influence by the imposition of the presumption; that the proponent may rebut the presumption by clear and convincing evidence of
1. good faith on the part of the beneficiary;
2. testatrix's full knowledge and deliberation of her actions and their consequences; and
3. advice of (a) competent person, (b) disconnected from the testatrix, and (c) devoted wholly to the testatrix's interest,
Harris v. Sellers, 446 So2d 1012 (Miss., 1984).
At the time of the execution of her Last Will and Testament, same being January 8, 1982, the decedent, Bertha O. Haney, was in all respects possessed of testamentary capacity and was a strong-willed person. In the preceding month, December, 1981, without the approval of her grandson/proponent, she made the decision to purchase a house and move from Mathiston to Eupora, Mississippi. The proponent, although not approving, he and members of his family assisted her in this move. The fact that the decedent was an independent, strong-willed person is acknowledged by her daughter-in-law, Mrs. Lorene Haney; the contestant, Mrs. Janie H. Austin; her former attorney, W.B. Meek; and her last attorney W.P. Fortner, Jr. Both Attorney Meek and Attorney Fortner testified that the decedent was a very able business woman and that, in the management of her affairs, she was definite and specific. In defending the other complaint filed by the parties hereto together with their mother, Mrs. Lorene Haney, the decedent clearly demonstrated an awareness of her estate and an understanding of the persons to be the natural inheritors of her bounty under the laws of descent and distribution. That which is most apparent is the reconciliation between grandmother and grandson and the animosity which rises to hostility between brother and sister, and between son and mother. Such animosity is reflected in purported statements of the proponent that "I have no mother."
To be considered is whether or not the decedent had the advice of a competent person disconnected from the beneficiary and devoted wholly to the testatrix's interest. C.P. Fortner, Jr., was the only lawyer retained by the decedent after her son John's death in 1976. As is the nature of the practice of a country lawyer, he often performs legal services for several members of the same family. There is nothing in this record to indicate that C.P. Fortner, Jr., was anything else other than the attorney for the decedent. On January 4, 1982, the decedent requested that her great grandson, Jim Haney, drive her to "Little *1364 Pete's office." She did not divulge the nature or purpose of her visit. The proponent had no knowledge of, and did not participate in, the initial meeting of the decedent and her attorney. At the initial meeting, in the privacy of the attorney's office, the matter of the preparation of her Last Will and Testament was fully discussed. As she requested and directed, her subject will was subsequently drafted. Although on January 8, 1982, the proponent did provide the transportation on her return to her attorney's office, he did not in any way participate in the execution of subject will. In fact, the proponent remained in the outer waiting room of the law office and did not accompany the decedent and her attorney into his private office. Only after reading and reviewing the will and being fully understood by her was it duly executed. A fee of Twenty Dollars for consultation and preparation was paid by the decedent to her attorney.
As heretofore noted, the proponent/grandson became the apple of the decedent/grandmother's eye. He and his family administered to her daily. Our Court, in Barber v. McClure, [250 Miss. 396], 165 So2d 156 (Miss., 1964), held that, standing alone, the testatrix in her will acknowledging her appreciation would be insufficient to establish undue influence:
Human emotions are oftentimes governed by likes and dislikes. This Court will not be a party to impaling the trait of gratitude upon a cross of sin and dishonor, for it is mindful of the adage, so truly expressed by the poet, when he said, "Blow, blow, thou winter wind, thou are not so unkind as man's ingratitude."
This Court will not be so insensitive to penalize that which should be recognized as a much-desired human trait of the young attending to the needs of the elderly. A grandson's devotion and attention to his grandmother is not an act of bad faith.
It is, therefore, the opinion of the Court that the relief sought by the contestant ought to be and is hereby denied and all costs of this proceeding be and are hereby assessed to the contestant.

* * * * * *
 EMB "Z", Page 7
FILED OCT 16, 1985, 1:30 P.M.
WEBSTER COUNTY
J.D. ROBERTSON
CHANCERY CLERK
NOTES
[1] She was 86 at the time of her death, approximately a year and a half after execution of the will.