ROBERTSON, Justice,
for the Court:
I.
This is a rather sad case in which circumstances and human frailty have somehow placed family members at each other’s throats. At issue is a rather modest estate of a now 87-year-old woman whose sister and niece have become alienated from her late husband’s family. In an effort to achieve peace the Chancery Court appointed the niece and the late husband’s grandnephew as co-conservators. Still, only strife, acrimony and charges of wrongdoing and outright theft continue to be hurled back and forth.
On appeal, a wide variety of rulings by the Chancery Court have been challenged. We have taken these quite seriously and have studied them with care. In the end we may only conclude that in each instance the Chancery Court was either correct as a matter of law or acted well within its discretion or made findings of fact supported by substantial evidence. We affirm.
II.
A.
Arlelia Stallings was born in 1901. She and her husband, Rev. Matthew Jasper Stallings, lived together in their home in Greenwood until the Reverend’s death on January 1, 1980. Sometime after her husband’s death, Stallings went to live with her sister, Rosa Stewart, in Starkville. Stewart is the mother of Co-Conservator Nausead Stewart. This arrangement lasted until Christmas, 1981, when Stewart went to New York to visit relatives for the holidays. During Christmas, 1981, Stall-ings went to spend the holidays with some of her husband’s family at their Starkville home. She moved into Curtis and Annie Bush’s home at that time and, as far as the *51 record reflects, she has remained there ever since. Annie Bush is Rev. Stallings niece and Co-Conservator Bush’s mother.
Co-Conservator Bush has lived in Greenwood since 1968 when he moved there to become a teacher in the Greenwood Public School System. In May, 1983, at the time of this conservatorship hearing, Herman Bush lived in Stallings’ house rent-free. He also managed Stallings’ rental property, collected the rental income for her, and looked after any business affairs that she requested. Co-Conservator Bush had begun to help Rev. Stallings with his business affairs approximately six months before the Reverend’s death. Arlelia Stallings testified that everything that Co-Conservator Bush did he did at her request and that she trusted him implicitly and didn’t even ask him questions concerning how he conducted her business affairs. None of the parties to this action or witnesses at the conservatorship hearing dispute the above facts.
The dispute at the time of the conserva-torship hearing centered around whether or not Stallings was in need of a conservator. Stallings, Co-Conservator Bush, and Annie Bush were of the opinion that she did not need any help. Co-Conservator Stewart and her mother, Rosa Stewart, were of the opinion that Stallings did need a conservator. Everyone, including Stallings herself, believed or conceded that she was forgetful. It was apparent during questioning by counsel for both parties, that Stallings did not have a good grasp of dates or the extent and complete nature of her holdings. She was, however, aware that she had filed suit against her sister to recover some property and generally knew what property she owned. It was generally agreed that at no time in her life had Stallings concerned herself with business affairs. She did not even do the grocery shopping. Her husband did.
B.
On January 28, 1983, Arlelia L. Stallings and Annie M. Bush, her niece, filed in the Chancery Court of Oktibbeha County a petition to determine need for a conservator of Stallings’ estate. Rosa Stewart, Stall-ings’ sister, entered her appearance in the matter. On May 18, 1983, the Court entered its order establishing the conserva-torship and appointing Nausead Stewart and Herman Bush as co-conservators “to take care of her [Stallings] estate.” By a subsequent order of August 14, 1984, the establishment of the conservatorship was confirmed. The inventory subsequently filed reflects a personal estate of $93,-894.00, plus interests in three pieces of real property the value of which is not given.
Numerous motions, proceedings, hearings, and orders appear in the record thereafter. We will mention those below only as necessary to considerations of the issues addressed in this opinion. Suffice it to say that Co-Conservator Stewart is unhappy with just about everything the Chancery Court has done since day one.
III.
Co-Conservator Stewart argues that the Chancery Court erred in refusing to allow her to appeal without costs and to supersede the judgments below without bond. In this she is partially correct.
Miss.Code Ann. § 11-51-99 (Supp.1987) provides that conservators appealing orders affecting them in their fiduciary capacity “shall have a supersedeas on such appeal, without bonds for supersedeas; but they shall pay the costs of the lower court including the Supreme Court filing fee.” This amended version of Section 11-51-99 has been in effect since 1978. See also Conservatorship of Harris v. King, 480 So.2d 1131 at 1133 (Miss.1985) (“thus, the statute by its character does say that such a conservator is entitled, on appeal, to a supersedeas without bond.”)
On the other hand, Section 11-51-99, by its language, requires Stewart to pay court costs and transcription costs. It appears from the record that the chancery court was never presented with the opportunity to deny or grant Stewart supersedeas without bond. However, § 11-51-99 mandato-rily requires supersedeas without bond in the present circumstances. As such, Stew *52 art is entitled to supersedeas without bond on this appeal.
IV.
Stewart argues that the Chancery Court erred in failing to establish a true conser-vatorship. The particulars of this argument are that between May 12, 1983, and August 14,1984:
(1) the Chancery Court allowed Stallings to continue managing her property;
(2) the Chancery Court failed to require that the conservators post bond {see § 93-13-17), yet ordered personal property re-conveyed to the ward and ordered an inventory; and,
(3) the Chancery Court lacked authority to require Conservator Stewart to file the records and the history of the transactions involving the C.D.s on deposit in Jackson banks because there was no conservatorship.
At the first conservatorship hearing in May, 1983, the Chancery Court specifically did order that Stallings be allowed to continue to provide for herself:
No limitations nor restrictions are placed on Mrs. Stallings’ banking or checking rights and privileges to provide herself with the necessities and comforts she may wish to enjoy. All gifts, transfers, and conveyances are to be approved by the court.
While the Court did allow Stallings to continue providing for personal needs, it is clear from the last above-quoted sentence, that, contrary to Stewart’s assertion, the Court did not allow Stallings to continue managing her property.
Regardless of the deficiencies prior to August 14, 1984, Stewart argues that the ultimate conservatorship established on August 14, 1984, is also deficient in that Stallings is allowed free rein over a checking account and because the conservators do not control the ward’s property. At the conclusion of the August 14, 1984, hearing, the Court ordered that a conservatorship account be established for the maintenance of Stallings' personal property. The Court further ordered that the conservators establish a checking account for Stallings with a maximum deposit of $2,000, over which the conservators were to exercise no control other than to replenish the account should it fall below $500. All real property was to be maintained in Stallings’ name alone. Stewart does not allege that the land records do not give notice that Arle-lia’s real property is under a conservator-ship.
The Chancery Court has discretion in determining whether a ward under con-servatorship should have an allowance and, if so, how much allowance that ward should be granted. This is so because, unlike wards who have been declared non compos mentis, wards under conservator-ship may have sufficient mental ability to manage a limited monthly income.
By statute, a conservatorship of an estate may be established for the estate of any person who “by reason of advanced age, physical incapacity or mental weakness is incapable of managing his own estate ...” Miss.Code Ann. § 93-13-251 (1972). In Harvey v. Meador, 459 So.2d 288 (Miss.1984) this Court outlined the facts necessary to support a determination that a person’s advanced age, physical incapacity or mental weakness is such that a conservator need be appointed. The Court noted that conservatorship statutes “have broadened the definition of persons for whom assistance can be afforded by the courts, and such statutes do not restrict such protection only to the adult incompetent or insane.” Harvey, 459 So.2d at 291.
Furthermore, conservatorships are controlled by “all laws relative to the guardianship of a minor.” Miss.Code Ann. § 93-13-259 (1972). Miss.Code Ann. § 93-13-38 (Supp.1987) in part provides:
It shall be the duty of the guardian of wards ... to improve the estate committed to his charge, and to apply so much of the income, profit or body thereof as may be necessary for the comfortable maintenance and support of the ward ... after obtaining an order of the court fixing the amount, [emphasis added]
Rule 6.09, U.C.C.R., offers further guidance:
*53 Every petition for an allowance for the support of a ward shall show the amount of his estate then on hand, the amount of his monthly or yearly income, the amount of the previous allowance.
The Chancery Court in this case was concerned with protecting Stallings’ estate from depletion by others prior to her death. Neither the court nor the parties were attempting to deprive Stallings of a comfortable existence.
We begin, therefore, with the underlying reality. Competency is not an either/or. In considering whether a conser-vatorship should be established, the Chancery Court is inevitably in the relative world of shades of gray. Some persons are so incapable of handling their affairs that a conservator must be charged to do everything. Yet there are many circumstances where it is neither necessary nor desirable that the conservator write a check for every tube of toothpaste or soft drink that the ward may wish to purchase. Suffice it to say that our law vests in chancery courts broad (though not unfettered) discretion to authorize modest allowances to be given the ward under conserva-torship and used by the ward as he or she sees fit without further accounting. The allowances provided in this case were well within the Chancery Court’s discretionary authority.
This assignment of error is without merit and is denied. In saying this, we recognize that Stewart has offered other and additional reasons why the conservatorship was deficient in form and organization. We find these arguments without merit and in need of no discussion.
V.
A.
Co-Conservator Stewart argues that the Chancery Court erred in allowing attorneys fees on a contingency fee contract Stallings made in 1982. It seems that on April 20, 1982, prior to the establishment of the conservatorship, Stallings entered into a contract for the employment of James E. Brown, attorney, of Starkville, Mississippi. Stallings’ purpose was to bring suit against Rosa Stewart to recover certain property. Pursuant to that contract she promised to pay Brown one-third of any money or property recovered as a result of a lawsuit or settlement. The property and money were identified in the contract as that “belonging to my late husband’s estate ... and to which I am the sole heir at law.”
In due course thereafter, Stallings filed suit against Rosa Stewart in the Chancery Court of Leflore County. On October 18, 1984, the Chancery Court entered its final order in that suit which required reconveyance:
By warranty deed from, Rosa Rogers Stewart to Arlelia L. Stallings, that real property described in paragraph 1 of the temporary order, and the Court further orders the immediate transfer of the funds described in paragraphs 2 and 3 of the temporary order to the conservator-ship of Arlelia L. Stallings, and that the parties reconveying the real property and transferring the personal property, as aforesaid, provide the Chancery Clerk of Oktibbeha County, Mississippi, with evidence of such reconveyance and transfer, forthwith.
Thereafter, pursuant to the contingency fee contract, Brown sought to collect $25,-605.11 in attorneys fees. The matter was heard in the Chancery Court of Oktibbeha County by reason of the conservatorship. After a full hearing thereon, the Chancery Court held that Stallings was competent when she entered the April, 1982, contract and that Brown had rendered essential service in the successful recovery of her property. Brown’s fee, accordingly, was approved.
On appeal, Co-Conservator Stewart argues that, in 1982, prior to the establishment of the conservatorship, Stallings was mentally incompetent to enter into the contract. Here, of course, she paddles upstream against our familiar substantial evidence rule. Blissard v. White, 515 So.2d 1196, 1199 (Miss.1987); Culbreath v. Johnson, 427 So.2d 705, 707-09 (Miss.1983).
*54 The record reflects that back in April of 1982, Curtis Bush and another relative, Allen Stallings, suggested that Stallings contact Attorney Brown for help in recovering her property. Curtis Bush and Stallings visited Brown’s office. She remembers reading the contract before she signed it, signing the contract, and she remembers that Curtis Bush was present and signed as a witness to that contract. Stallings could not remember the exact percentage of the fee that the contingent fee contract authorized, but she did know what that percentage was in 1982 when she signed the contract. Stallings testified on cross-examination that she owed Brown for his services, that she had promised to pay him, and that he had done his job and had helped her a lot. Curtis Bush verifies that Stallings understood the contractual provisions, that he was present when she signed, and that he signed as a witness. Curtis Bush also testified that he and Stallings returned to Brown’s office at a later date and agreed that Brown would receive only one-third of the money recovered from the certificates of deposit on deposit in Jackson banks. Co-Conservator, Herman Bush, verified that this oral modification of the contract occurred.
Without further ado we conclude without serious doubt that there is evidence in the record ample to undergird the Chancery Court’s decision to allow Brown to receive his contingency fee out of conservatorship estate funds. The assignment of error is denied.
B.
Co-Conservator Stewart further argues that only the Chancery Court of Leflore County could determine the fee issue as that was the court in which the suit was brought and the county where the land was located. Furthermore, Stewart accuses Brown of forum shopping and asserts that the Chancery Court of Leflore County would never have allowed Brown the full one-third fee. These arguments are wholly without merit. The Chancery Court of Ok-tibbeha County was the court in which the conservatorship was being administered. Before any fee could be allowed out of the conservatorship estate, the matter had to be presented to and approved by the Chancery Court of Oktibbeha County. This in fact was done. All assignments of error challenging the contingency fee allowed James Ed Brown are denied.
VI.
Co-Conservator Stewart assigns error in the Chancery Court’s award to her of attorneys fees incident to the establishment of the conservatorship. It appears that Stewart was allowed of and from the estate $2,712.80, the sum of $1500 being her attorneys fees and the balance reimbursement of out-of-pocket expenses. Stewart claims that the fee allowance is substantially inadequate. The search for the answer begins with Miss.Code Ann. § 93-13-257 (1972):
If the petition [for establishment of conservatorship] is sustained, the costs shall be paid out of the estate of the person for whom a conservator is requested, but if the petition be not sustained, the costs shall be paid by the party requesting the appointment of the conservator.
Stewart did petition the chancery court requesting that a conservatorship be established for her Aunt Arlelia’s estate. That petition was sustained and the conservator-ship was established.
The Chancery Court has substantial discretion regarding fees and expenses allowed in this context. Rule 6.01, U.C.C.R., is headed “Solicitor Must Be Retained” and provides:
Every executor, administrator and guardian and all fiduciaries must, unless he is licensed to practice law, retain a solicitor or firm of solicitors to represent, advise and assist him during the whole term of his office, whose compensation will be fixed, or approved by the court or chancellor. [Emphasis added]
Having in mind the broad discretion vested in the Chancery Court in determining the amount of attorney’s fees to award as part of the costs of establishing a conservator-ship, we can only affirm. Indeed, the essence of such discretion is that the court has two or more alternative courses any *55 one of which it may elect without being reversed. That a higher fee may have been allowed is beside the point. Having in mind the totality of the circumstances reflected by this record and relevant to this point, we hold this assignment of error to be without merit.
VII.
Co-Conservator Stewart makes numerous additional complaints regarding the proceedings below. These range from a charge that Co-Conservator Bush was allowed to use the ward’s property for his own benefit and profit to a claim that the Chancery Court erred in failing to appoint a guardian ad litem in connection with the first conservatorship hearing to claims that the Chancery Court preferred Co-Conservator Bush over her and was substantially prejudiced against her. Each of these points was dealt with deliberately in the Chancery Court. Acting well within its discretion, we find that the Chancery Court resolved each of these matters in such a form and manner that we have no authority to intervene.
This has been a difficult conservatorship with many sticky and unorthodox issues tendered by the parties. The Chancery Court is quite obviously convinced that Co-Conservator Bush has acted with prudence and all good fidelity to his ward, notwithstanding that Stewart appears destined never to accept that fact. We perceive that no intervention in the proceedings below is required, nor, in the interest of the estate of Arlelia Stallings, would it be likely to do more good than harm.
AFFIRMED.
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.JJ., and PRATHER, SULLIVAN, GRIFFIN and ZUCCARO, JJ., concur.
ANDERSON, J., not participating.