T.C. Memo. 1997-73

UNITED STATES TAX COURT

LARRY L. BEELER AND CYNTHIA J. BEELER, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 16052-94.              Filed February 10, 1997.

<u>J. Paul Raymond</u> and <u>Marie De Marco</u>, for petitioners.

<u>Judith C. Winkler</u> and <u>Benjamin A. de Luna</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

COLVIN, <u>Judge</u>:  Respondent determined a deficiency of
$266,375 in petitioners' income tax for 1991.

After concessions, the issue for decision is whether
petitioners may defer recognition of all of the gain that they
received for an exchange involving real property in 1991 under
section 1031, as petitioners contend, or only part of the gain,

as respondent contends.  Our decision on this issue depends on whether we decide, as respondent contends, that petitioners exchanged, in addition to real estate, assets which do not qualify under section 1031, such as property held for sale (i.e., sand), certain business operating permits, goodwill, and going-concern value, or whether we decide, as petitioners contend, that petitioners exchanged only property that qualifies under section 1031.[1]  We agree with petitioners, and hold that all of the gain they received in the exchange qualifies under section 1031.

Section references are to the Internal Revenue Code as in effect for the relevant periods.  Rule references are to the Tax Court Rules of Practice and Procedure.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

A.  <u>Petitioners</u>

Petitioners are married and lived in Port Richey, Florida, when they filed the petition in this case.

B.  <u>The Real Property</u>

Petitioners owned a mobile home park called Brentwood Estates in Pasco County, Florida.  On April 25, 1984, they paid $766,808.78 to buy about 76.5 acres of vacant land zoned for a

---

[1]Respondent determined in the notice of deficiency that petitioners could not defer any gain under sec. 1031 for their exchange of property in 1991.  Respondent conceded at trial and in the posttrial brief that the land qualifies for like-kind exchange treatment.

mobile home park (the 76.5 acres) next to Brentwood Estates so they could expand their mobile home park.  This was their primary purpose in buying and holding the land until they listed the property for sale or exchange (described below at par. D-1).

The 76.5 acres had natural mounds of sand on it. Petitioners bought the 76.5 acres on the condition that they could obtain a Pasco County permit to mine sand from it.  Their contract with the seller required that petitioners pay the seller $.75 per cubic yard of sand that they removed.

C.   Petitioners' Sand Mining Activities

1.   Issuance of Mining Permit to Petitioners

Petitioners applied to Pasco County for a permit to mine sand from the 76.5 acres.  At that time, Pasco County required an applicant for a permit to mine sand to submit a plan showing how he or she intended to mine and reclaim the property.  Pasco County required the applicant to submit engineering studies, subsurface boring tests, a legal description, an environmental impact statement, a drainage and flood development plan, a processing plan, and a transportation plan.  The applicant had to show that he or she had a legal interest in the land.  The applicant also needed to show financial responsibility, usually by obtaining a performance bond for the required work.

Pasco County staff reviewed the plan, made comments, and returned it to the applicant.  The applicant responded to the

staff comments. The staff then prepared a recommendation for a development review committee that consisted of assistant county administrators. That committee reviewed it and submitted recommendations to the Board of County Commissioners (B.C.C.). The B.C.C. held a public hearing and made a decision.

Petitioners obtained a mining permit on September 28, 1984, that allowed them to extract 600,000 cubic yards of sand from about 57 of the 76.5 acres. They stated on their application that they ultimately intended to use the 76.5 acres as a mobile home park.

## 2. Permit Procedures When Property is Transferred

A permit holder may not sell or transfer his or her Pasco County sand mining permits. Pasco County would have immediately suspended the permit if its code enforcement staff discovered that a permit holder had tried to sell or transfer it.

If property in Pasco County for which a sand mining permit has been issued is sold, the buyer may not mine sand unless the County issues a permit to the buyer. The buyer must apply for a permit under the procedures described above. A buyer may use the engineering studies that had been submitted by the seller if nothing has changed. The B.C.C. may approve, approve with conditions, or deny the application. The current permit holder and the person who wants the permit may apply jointly. Approval is sometimes called a "transfer" of the permit, but Pasco County,

not the prior permit holder, decides whether to transfer a permit.

3.  Petitioners' Sand Mine

Petitioners sold sand to customers on the 76.5 acres from 1984 to October 16, 1991. Petitioners called their business Sunset Sand Mine. Their business office was a small recreational vehicle at the mine site.

Petitioners did not own any equipment to mine the sand. They subcontracted removal and loading of sand. The subcontractor brought in a loader and operator to dig the sand and put it in trucks. Petitioners' first subcontractor was Aaro Excavating, Inc. (Aaro). Aaro had financial difficulty and closed. Petitioners then rented equipment and hired an operator for a short time. They later subcontracted with Bolton Road Landfill, Inc. (Bolton Landfill) to dig and load the sand. Milo Dakic (Dakic) and Raymond Fontana (Fontana) owned Bolton Landfill.

Builders, excavating companies, and trucking companies bought sand from petitioners. Petitioner Cynthia J. Beeler (Mrs. Beeler) or her mother sold sand and collected money. Mrs. Beeler was at the site about 3 days a week. Petitioners reported the income from the sand business on a Schedule C attached to their income tax returns. Petitioners claimed depletion deductions for the sand totaling $712,317.14 from 1984 to October 16, 1991.

4.   Modification of Petitioners' Permits

On September 17, 1985, the B.C.C. approved petitioners' request to modify petitioners' sand mining permit.  The modification allowed petitioners to extract 1.18 million cubic yards of sand from the 76.5 acres.

In 1989, petitioners asked the B.C.C. to modify the permit a second time to increase the amount of sand that they could remove from the 76.5 acres to 2.49 million cubic yards by permitting removal of sand up to 12 feet below the surface.[2]  On the application to modify the permit, petitioners stated that they intended to apply for a construction and demolition debris dump permit after mining is complete, and later to use the 76.5 acres as a mobile home park.  The B.C.C. approved petitioners' second request to modify the permit on March 21, 1989.

D.   Petitioners' Exchange of the 76.5 Acres

1.   Listing the Property for Sale

Petitioners listed the 76.5 acres with a realtor to sell as a mobile home park, sand mine, or construction and demolition debris dump.  There was a large demand for construction and demolition debris dumps in Pasco County when petitioners listed the 76.5 acres for sale.  David Gilmore (Gilmore) was

---

[2]Petitioners sold about 1,277,470 cubic yards of sand while they owned the 76.5 acres.

petitioners' attorney. He represented them in the exchange of the 76.5 acres.

Petitioners did not have a construction and demolition debris dump permit when they listed the 76.5 acres for sale. Petitioners applied to Pasco County for a construction and demolition debris dump permit. They stated on their application that they ultimately intended to use the 76.5 acres as a mobile home park. The B.C.C. approved petitioners' application. Potential buyers became more interested in the property after petitioners obtained a construction and demolition debris dump permit.

The Pasco County permit was not the only permit petitioners needed to operate a construction and demolition debris dump on the 76.5 acres. They did not operate a dump while they owned the 76.5 acres, and they did not have all the permits required to do so.

A prospective buyer of the 76.5 acres retained Triggs, Catlett & Associates in June 1990 to estimate the value of the land and various values and costs related to the prospective buyer's operation of a sand mine on the 76.5 acres. Frank A. Catlett (Catlett), a real estate appraiser, estimated that the value of the land was $1,163,000, before taking into account any costs of equipment or other assets required to operate a sand mine or any going-concern value of petitioners' sand mine.

Catlett's client did not buy the 76.5 acres or petitioners' sand mine business.

2. The Buyers

Dakic and Fontana (the buyers) wanted to buy a construction and demolition debris dump site in Pasco County. They had one landfill that was nearly full.

Operating a construction and demolition debris dump was more profitable to the buyers than operating a sand mine. The sand on the 76.5 acres had no value to the buyers. The buyers would have preferred to have obtained land with a hole in the ground.

The buyers did not want to acquire petitioners' sand mine business. They did not ask to see petitioners' sand mine business records. Petitioners did not show their business records to the buyers.

Initially, Dakic negotiated for the buyers. Later, attorney Robert C. Burke (Burke) represented the buyers to help them acquire the 76.5 acres and Pasco County permits. The only item or property that petitioners conveyed was the 76.5 acres. Petitioners did not have a customer list, trucks, or other equipment. The buyers did not want those items and did not obtain them from petitioners.

Gilmore negotiated the exchange of the 76.5 acres for petitioners. The subject of conveying petitioners' business was not discussed during the negotiations.

3.  Contract for Like-Kind Exchange

On October 3, 1990, petitioners signed a contract entitled "Real Estate Contract for Like-Kind Exchange" (the contract) to convey the property to the buyers. An addendum to the contract gave the buyers 30 days after signing the contract to perform field tests to see whether the 76.5 acres was suitable for use as a landfill and sand mine. The buyers could have their deposit returned only if they decided that the 76.5 acres was not suitable for use as a construction and demolition debris dump and sand mine, or if they did not obtain construction and demolition debris dump and sand mine permits from Pasco County.

The addendum allowed petitioners to operate the sand mine until the transfer to the buyers closed. This benefited the buyers, who wanted sand to be removed. The buyers had the right to review petitioners' records to verify that petitioners did not jeopardize the property, e.g., create liens.

The addendum provided that if the buyers obtained new permits and then defaulted on the contract, the buyers agreed to pay petitioners' expenses to obtain the permits that petitioners had obtained before signing the contract.

On November 9, 1990, the parties extended the closing date under the contract because the buyers did not know if Pasco County would permit them to deposit debris from outside the

county in a dump on the 76.5 acres. The buyers had the right to cancel the contract if they could not do so.

Petitioners transferred the 76.5 acres to the buyers by warranty deed on October 16, 1991. The buyers paid $1.2 million for the 76.5 acres. Petitioners mined about 130,000 cubic yards of sand from the 76.5 acres during the time the contract was executory. The buyers did not request any price adjustment.

Florida had a bulk sale law when petitioners exchanged the 76.5 acres with the buyers that required parties to a transfer of a business to list all equipment, materials, and stock in trade to avoid the presumption that the transfer is a fraudulent conveyance. Fla. Stat. Ann. secs. 676.101-109 (West 1993)(repealed by 1993 Fla. Laws ch. 93-77, sec. 3). Burke did not try to comply with the bulk sale law because he believed petitioners exchanged real estate, not a business with equipment or stock in trade. The buyers did not receive a bill of sale for any chattels. Burke obtained land title insurance and paid for real estate documentary stamps based on the $1.2 million contract price.

The 76.5 acres remained zoned for a mobile home park during the time petitioners held it.

In exchange for the 76.5 acres, petitioners received title to the Mosquito Control Building, Palm Coast Storage, and a bank building (the acquired properties). The acquired properties were

rental properties. Petitioners identified the acquired properties within 45 days of October 16, 1991. They received title to the acquired properties within 180 days of October 16, 1991. The acquired property was real property held for productive use in a trade or business or for investment.

4. Permits for the Buyers

Burke obtained new permits from Pasco County for the buyers to operate a sand mine and a construction and demolition debris dump at the 76.5 acres. He obtained all of the permits that the buyers would need to operate a construction and demolition debris dump, including permits from the Florida Department of Natural Resources. The buyers paid more than $100,000 to their attorneys, engineers, and to Pasco County to obtain the permits. The buyers gave sand away from the 76.5 acres.

The buyers incorporated their business as Sunset Sand Mine, Inc. and transferred the 76.5 acres to it.

E. Pasco Lakes, Inc.

In 1989, Larry Gilford (Gilford) owned 50 percent of the stock of Pasco Lakes, Inc. (Pasco Lakes). In September 1989, Pasco Lakes paid $675,000 for vacant land zoned for agricultural use. Pasco Lakes obtained permits to mine sand from the land. Gilford sold the stock of Pasco Lakes to Environmental Capital Holdings, Inc. (Environmental) on September 19, 1991. Environmental bought stock instead of the land because it wanted

the permits and an operating business.  Otherwise it would have been required to apply to Pasco County and follow the rigorous procedure to obtain permits for itself.

F.   Petitioners' Income Tax Returns

Petitioners filed a joint income tax return for 1991.  They reported on Form 4797, Sale of Business Property, that they exchanged for $1.2 million sand mine property that they bought in 1984.  They attached a statement to the return which was entitled, "Exchange of Sand Mine for Like Business Real Estate." In their statement they reported that they took depletion deductions from 1984 to 1991 totaling $712,317.14.

OPINION

A.   Contentions of the Parties and Background

A taxpayer may defer recognition of gain or loss from qualifying exchanges of like-kind property.  Sec. 1031(a)(1).  A like-kind exchange occurs if property held for productive use in a trade or business or for investment is exchanged solely for property of like kind that is to be held either for productive use in a trade or business or for investment.  Sec. 1031(a)(1). A taxpayer recognizes gain in a like-kind exchange under section 1031 to the extent of the fair market value of any nonqualifying property exchanged.  Sec. 1031(b).

Petitioners contend that the only property they exchanged was the 76.5 acres, and that they may defer recognition of the

gain from the $1.2 million exchange price for the 76.5 acres under section 1031. Respondent concedes that petitioners may defer the gain under section 1031 to the extent that it relates to the land. However, respondent contends that petitioners exchanged certain business operating permits, goodwill, going-concern value, and property held for sale (i.e., sand), which are nonqualifying properties under section 1031.

B.   What Petitioners Transferred to the Buyers

   1.   Whether Petitioners Transferred Tangible Property Other Than Land

Petitioners contend that they transferred only land to the buyers. Respondent contends that petitioners exchanged land and other assets. We agree with petitioners.

Mrs. Beeler, Dakic, Burke (the buyers' attorney), and Gilmore (petitioners' attorney) testified that the only asset petitioners transferred was real property. The deed conveying the 76.5 acres states that petitioners conveyed land to the buyers; it does not state that petitioners conveyed anything else. There are no other documents conveying title from petitioners to the buyers for any other property. The parties treated the land as the only property transferred for title insurance and real estate transfer tax purposes. There were no bills of sale for any chattels. There is no evidence to support respondent's contention that petitioners exchanged an office, a fence, vehicles, equipment, or anything other than land.

Respondent contends that we should give no weight to the testimony of Mrs. Beeler, Dakic, Burke, and Gilmore because it was self-serving and unbelievable. We disagree. We may not arbitrarily disregard unimpeached, competent, and relevant testimony. Conti v. Commissioner, 39 F.3d 658, 664 (6th Cir. 1994), affg. 99 T.C. 370 (1992) and T.C. Memo. 1992-614; Loesch & Green Constr. Co. v. Commissioner, 211 F.2d 210, 212 (6th Cir. 1954), revg. a Memorandum Opinion of this Court. Mrs. Beeler, Dakic, Burke, and Gilmore testified in a manner fully consistent with the documents related to the transaction at issue and with each other's testimony. Respondent produced no evidence to the contrary.

We conclude that petitioners transferred land and no other tangible property to the buyers.

2. Whether Petitioners Exchanged Their Mining and Construction and Demolition Debris Dump Permits

Respondent contends that petitioners exchanged their Pasco County sand mining and construction and demolition debris dump permits with the 76.5 acres. We disagree.

The parties to the exchange and their attorneys testified that petitioners did not exchange their Pasco County permits. The documents conveying property in the exchange did not list the permits.

Cynthia Jolly (Jolly) was the Code Enforcement Director for Pasco County at the time of trial. She was very knowledgeable

about Pasco County permit procedures.  Respondent relies on the fact that Jolly answered in the affirmative when asked, "Is a permit transferrable?"  Respondent misses the point made clear by Jolly's other testimony, that a permit may be transferred only by Pasco County, and not by a permit holder.  Jolly testified clearly that petitioners could not transfer their Pasco County permits and that the B.C.C. must independently approve issuance of a permit to a new permittee.  Thus, petitioners could not sell or exchange their Pasco County sand mine or construction and demolition debris dump permits.

Respondent contends that Pasco County permits are analogous to easements, grazing rights, FCC licenses, and liquor licenses, which are generally transferrable.  E.g., In re Atlantic Bus. and Community Dev. Corp., 994 F.2d 1069, 1075 (3d Cir. 1993); Ward v. Commissioner, 58 F.2d 757 (9th Cir. 1932); Osborne v. Commissioner, 87 T.C. 575 (1986); Uecker v. Commissioner, 81 T.C. 983 (1983), affd. 766 F.2d 909 (5th Cir. 1985); Radio Station WBIR, Inc. v. Commissioner, 31 T.C. 803, 813 (1959); Tube Bar, Inc. v. Commissioner, 15 T.C. 922 (1950).  Respondent's argument does not apply because petitioners did not transfer their Pasco County permits.

Respondent called Catlett as an expert witness to appraise the 76.5 acres as of June 1990.  He testified that the 76.5 acres would be worth $1,163,000 with permits and $710,000 without

permits. Respondent contends that this shows that petitioners transferred the permits. We disagree. The $1.2 million exchange value is consistent with Catlett's appraisal of the 76.5 acres because it was contingent on issuance by Pasco County of the needed permits to the buyers, not because petitioners transferred their permits to the buyers. The effect on the value of the land of a seller having Pasco County permits is analogous to the effect of receipt of a favorable zoning classification. The existence of both depends on governmental action. Both can add value to the land. A new buyer may expect that zoning will not change and may pay more for property because of that expectancy. Similarly, a buyer of land, the seller of which has a Pasco County permit, may expect that his or her application for a new permit will be approved, and may pay more for the land because of that expectancy. However, a seller cannot sell either a permit or a zoning classification.

We conclude that petitioners did not sell their Pasco County permits.

### 3. Whether Petitioners Conveyed Goodwill or Going-Concern Value

Respondent contends that petitioners transferred $37,000 of goodwill or going-concern value with the 76.5 acres. Respondent points out that petitioners called their sand business the "Sunset Sand Mine," and the buyers formed a corporation named "Sunset Sand Mine, Inc." Respondent contends this shows that

petitioners sold goodwill and a going-concern to the buyers. Respondent points out that petitioners had a good business location and customers and that the contract for exchange required petitioners to operate and maintain their business.

Going-concern value is the ability of a business to produce income even though there has been a change in ownership; goodwill is the existence of preexisting business relationships which may be expected to continue indefinitely. Ithaca Indus., Inc. v. Commissioner, 97 T.C. 253, 264 (1991), affd. 17 F.3d 684 (4th Cir. 1994). Whether goodwill and going-concern value exist is a question of fact. Id. at 263-264.

The parties did not discuss transferring or exchanging the sand mine business. Petitioners did not transfer any customer lists to the buyers. Petitioners did not transfer management systems or records to the buyers. The record does not show that petitioners had any property rights to the business name. Petitioners did not charge the buyers for transferring rights to use the business name. Dakic, Burke, Gilmore, and Mrs. Beeler testified that petitioners did not transfer to the buyers goodwill, going-concern value, or an ongoing business. The documents conveying property from petitioners to the buyers did not refer to goodwill or going-concern value. We conclude that any goodwill or going-concern value transferred by petitioners to the buyers was de minimis.

C.   Whether the Sand Was Stock in Trade or Property Held Primarily for Sale

Respondent contends that petitioners' unmined sand was stock in trade or other property held primarily for sale.

A taxpayer may not defer gain or loss under section 1031 for the exchange of stock in trade or other property held primarily for sale.  Sec. 1031(a)(2)(A).  Whether property is stock in trade or held primarily for sale for purposes of section 1031 is a question of fact.  See Verito v. Commissioner, 43 T.C. 429, 441-442 (1965).

Respondent points out that petitioners operated a sand mine on the 76.5 acres throughout the time they owned it.  They obtained a Pasco County sand mine permit before they bought the land and had the permit modified twice to increase the amount of sand they could remove from 600,000 cubic yards to 2.49 million cubic yards, of which they eventually removed 1.28 million cubic yards.

While petitioners did mine sand from the 76.5 acres, that was not their primary purpose in holding the land.  Their primary purpose was to expand their adjacent mobile home park, and that purpose never changed during the time they owned the 76.5 acres.  This intent is shown by Mrs. Beeler's testimony and by petitioners' consistent statements on permit applications filed with Pasco County in 1984, 1985, 1989, and 1990.

Respondent points out that Earl Hoover (Hoover), respondent's expert, testified that the unmined sand was inventory and not real estate.

Hoover estimated that there were about 1.28 million cubic yards of unmined sand on the 76.5 acres that was worth $569,460 at the time of the exchange. He also estimated that the air space to be used as a dump was worth $732,240. His analysis is unpersuasive because those two amounts total $1,301,700, more than the arm's-length exchange price of $1.2 million for the land. Hoover treated the unmined sand as inventory. He gave the real estate no value. We believe that the land had value. Catlett, who was not respondent's employee, estimated that the land was worth $1,163,000. We give Hoover's testimony little weight.

If property is exchanged as part of the land, it is not property held primarily for sale. Asjes v. Commissioner, 74 T.C. 1005, 1013-1014 (1980) (unharvested crop exchanged as part of land not property held primarily for sale for purposes of section 1031); Butler Consol. Coal Co. v. Commissioner, 6 T.C. 183, 188-189 (1946) (coal in an abandoned coal mine was part of the real property, not a separate asset). Here, sand was not separated from and was part of the land when petitioners exchanged it. The parties to the transaction did not list sand as property petitioners exchanged. Petitioners received no consideration

from the buyers for unmined sand. The parties to the exchange believed they were not required to comply with Florida's bulk sales law, which applied to sales of stock in trade. From the time petitioners first agreed to exchange the property for $1.2 million to the time they closed on the exchange, petitioners sold about 130,000 cubic yards of sand. Petitioners did not adjust the price of the 76.5 acres based on the sales.

Respondent cites Watson v. Commissioner, 345 U.S. 544 (1953), to support the contention that petitioners held the unmined sand primarily for sale at the time of the exchange. In that case, the taxpayer sold an orange grove with unharvested oranges. The buyer wanted to operate the orange grove and sell oranges, including the unharvested oranges. The issue was whether the portion of the price attributable to the unharvested oranges was taxable as a capital gain or as ordinary income. The Supreme Court pointed out that the parties attributed substantial value to the unharvested oranges and held that income from the sale of the unharvested oranges was ordinary income. Id. at 550-551. The seller sold and the buyer bought a crop of growing oranges and the real property on which it grew.

The Supreme Court distinguished Watson from Butler Consol. Coal Co. v. Commissioner, supra, and cases in which the sale of land included minerals "not separated from its natural state and not in the course of annual growth leading to a seasonal

separation."  Watson v. Commissioner, supra at 552.  We think the instant case is more like Butler Consol. Coal Co. v. Commissioner, supra, because the unmined sand was not separated from the land.  Respondent contends that Butler Consol. Coal is distinguishable from this case.  Respondent points out that petitioners operated the sand mine until the day they exchanged the land, while the taxpayer in Butler Consol. Coal stopped operating the mine 11 years before the transaction at issue.  We disagree that the distinction is material.  The Court in Butler Consol. Coal observed that "Coal in place is a part of the realty."  Primarily for that reason, the Court rejected the Commissioner's argument that the coal in place was held by the taxpayer for sale to customers in the ordinary course of business.  In the present case, similarly, the sand in question had not been mined or otherwise separated from the realty.  In addition, we have found that the parties to the sale did not intend to sell and buy sand as part of the transaction.

Respondent contends that the instant case is like Clemente, Inc. v. Commissioner, T.C. Memo. 1985-367.  There, the taxpayer exchanged the right to extract gravel from one parcel of land (but did not exchange the land itself) for another parcel of land.  The issue before the Court was whether land and the right to extract gravel from land were of a like kind.  That case does

not apply here because respondent concedes that the real property petitioners exchanged was of like kind.

Respondent contends that petitioners' subcontract with Bolton Landfill to remove sand was a joint venture between petitioners and Dakic and contends that this establishes that petitioners exchanged unmined sand. We disagree; petitioners and Dakic did not have a joint venture.

Respondent contends that we should decide whether petitioners transferred assets other than land to the buyers based on the substance of the transfer and not its form. We disagree that the substance of this transaction differs from its form.

We conclude that the unmined sand was not stock in trade or property held primarily for sale for purposes of section 1031.

D.   Conclusion

We conclude that petitioners conveyed only land and no other assets in exchange for property worth $1.2 million. Petitioners are entitled to defer recognition of gain on the $1.2 million because they received like-kind property in exchange. Sec. 1031.

To reflect the foregoing,

Decision will be

entered for petitioners.