# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2006-CA-00706-SCT

*W. WARREN CALLICUTT*

*v.*

*PROFESSIONAL SERVICES OF POTTS CAMP,*
*INC. AND DIANE G. TAYLOR*

| | |
|---|---|
| DATE OF JUDGMENT: | 03/28/2006 |
| TRIAL JUDGE: | HON. HENRY L. LACKEY |
| COURT FROM WHICH APPEALED: | MARSHALL COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | THOMAS A. WICKER |
| ATTORNEYS FOR APPELLEES: | LAURA CATHERINE NETTLES |
| | PEGGY C. JONES |
| NATURE OF THE CASE: | CIVIL - TORTS-OTHER THAN PERSONAL INJURY & PROPERTY DAMAGE |
| DISPOSITION: | AFFIRMED - 12/13/2007 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**EASLEY, JUSTICE, FOR THE COURT:**

¶1.     This is an appeal from a summary judgment entered in favor of the defendants, Diane G. Taylor and Professional Services of Potts Camp, Inc., "collectively Taylor." Warren Callicutt alleges that the trial court erred in: (1) finding that Callicutt suffered no damages as a matter of law and (2) finding that no issue of fact existed with regard to the duty Taylor owed Callicutt. Finding no error, we affirm the summary judgment.

**FACTS**

¶2.     On January 21, 2003, Callicutt entered into a contract to purchase approximately 954 acres of land from Dudley Moore for $2.6 million dollars.  Callicutt's intention was to develop, subdivide, and resell the property in individual, residential parcels.  Callicutt had engaged in four similar real-estate-development ventures prior to this time.  However, on February 21, 2003, prior to closing on the Moore property, Callicutt entered into an agreement with Marianne Hurdle to sell her the entire 954 acres for $3.8 million dollars.  On February 28, 2003, Callicutt closed on the Moore property, taking out a mortgage for 100% of the purchase price.  On March 5, 2003, Callicutt and Hurdle executed a revised purchase contract with some additional terms.  The Bank of Holly Springs contacted Taylor to perform the title work on Hurdle's behalf for the closing on the Moore property.

¶3.     Callicutt claims that he asked Taylor how he could reinvest his money to avoid paying income taxes.  Taylor told him that this could be accomplished with a Section 1031 like-kind exchange and proceeded to print and copy various materials on Section 1031 exchanges, providing the materials to Callicutt.  Under 26 United States Code Service Section 1031, when property held for productive use in a trade or business or for investment is exchanged for property of like kind that is also to be held either for productive use in a trade or business or for investment, the taxes or credits normally associated with any gain or loss are deferred.  Callicutt contends that Taylor informed him that executing a Section 1031 exchange would require a "qualified intermediary," and she had done Section 1031 exchanges in the past with Union Planters Bank acting as a qualified intermediary.  Callicutt claims that Taylor called

2

him after the meeting to inform him that Union Planters would perform the duties of a qualified intermediary for a fee of $2,000 and that she would have all the paperwork ready at the closing.

¶4. Taylor, however, claims that Callicutt asked her if she knew anything about exchanges. Taylor said she then provided Callicutt with some materials she had concerning Section 1031 like-kind exchanges, including contact information for companies. Taylor suggested that Callicutt contact these companies that specialized in Section 1031 exchange transactions. She also suggested that he contact a tax attorney and a certified public accountant (CPA). Taylor denies any discussion of using Union Planters as a qualified intermediary before the day of the closing between Hurdle and Callicutt on the 954-acre Moore property. Taylor claims that Callicutt arrived at the closing and asked that the purchase be structured as a Section 1031 exchange with Union Planters acting as qualified intermediary, thus requiring Taylor to prepare an exchange agreement to accommodate his request.

¶5. On April 10, 2003, Callicutt and Hurdle closed on the Moore property at Taylor's office. Taylor paid the mortgage on the property and prepared a check for the net profit of $1.2 million, made out to Union Planters as the qualified intermediary. Callicutt signed the exchange agreement between himself and Union Planters on April 10, and a representative of Union Planters signed it the following day, also picking up the check for $1.2 million.

¶6. In 2004, Callicutt's accountant prepared his 2003 taxes. The tax preparer informed Callicutt that the sale of the Moore property and his subsequent purchase of like-kind

3

property did not qualify as a tax-exempt Section 1031, like-kind exchange. As a result, Callicutt was required to pay more than $500,000 in taxes, penalties and interest on the transaction. Callicutt filed his complaint against Taylor and Union Planters on January 12, 2005.[1]

¶7. On March 28, 2006, Judge Henry L. Lackey granted the defendants' motions for summary judgment in the Circuit Court of Marshall County, finding that: (1) the cause of action for negligence could not be maintained because the transaction, regardless of any alleged action or inaction of Taylor, would not have qualified as a Section 1031 exchange as a matter of tax law, and thus Callicutt could show no damages caused by Taylor's alleged negligence; (2) Taylor owed no duty to Callicutt to advise him of tax consequences of his failure to purchase like-kind replacement property to effectuate a Section 1031 exchange; (3) Callicutt failed to prove any intentional or negligent misrepresentation by Taylor; (4) Taylor owed no fiduciary duty to Callicutt; (5) there was no evidence of a breach of good faith and fair dealing by Taylor; and (6) Callicutt's claims that Taylor was not qualified to render professional advice or failed to warn him concerning the tax consequences of the Section 1031 exchange failed as a matter of law, as Callicutt offered no evidence that Taylor held herself out as an expert on taxation or Section 1031 exchanges.

¶8. Aggrieved, Callicutt now appeals to this Court.

## DISCUSSION

---

[1] Callicutt also sued Union Planters Bank, N.A., but the parties have stipulated to the dismissal of all claims pertaining to Union Planters Bank, N.A.

4

¶9.    In reviewing a trial court's ruling on a motion for summary judgment, this Court conducts a *de novo* review.  In ***Smith v. Gilmore Memorial Hospital, Inc.***, 952 So. 2d 177, 180 (Miss. 2007), this Court set forth the standard of review for summary judgment as follows:

> "We employ the de novo standard in reviewing a trial court's grant of summary judgment." ***Brown v. J. J. Ferguson Sand & Gravel Co.***, 858 So. 2d 129, 130 (Miss. 2003) (citing ***O'Neal Steel, Inc. v. Millette***, 797 So. 2d 869, 872 (Miss. 2001)).   The moving party shall be granted judgment "if the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Miss. R. Civ. P. 56(c).
>
> "Summary judgments, in whole or in part, should be granted with great caution."  ***Brown***, 444 So. 2d at 363.   However, "[s]ummary judgment is mandated where the respondent has failed 'to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'"  ***Wilbourn v. Stennett, Wilkinson & Ward***, 687 So. 2d 1205, 1214 (Miss. 1996) (citing ***Galloway v. Travelers Ins. Co.***, 515 So. 2d 678, 683 (Miss. 1987) (quoting ***Celotex Corp. v. Catrett***, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)).

***Smith***, 952 So. 2d at 180.

### I.    As a matter of law, did Callicutt suffer damages as a result of the alleged misconduct?

¶10.    The primary issue in this case is what, if any, damages Callicutt can claim as a result of Taylor's alleged misconduct. Callicutt contends the following damages resulted from the alleged unlawful acts or omissions of Taylor: (1) $478,803 in taxes he claims could have been deferred under a properly-executed Section 1031 exchange; (2) $1,079,791.11 in lost future lease income resulting from his need to sell property to pay the taxes; (3) $18,992.89

5

in damages representing the penalties and interest he paid on the taxes that he was unable to defer; and (4) $13,943 as his cost of borrowing money in order to pay the taxes.

### A. Tax Damages.

¶11.    Examining the alleged damages of $478,803 in taxes, the lower court held that the Moore property was held primarily for sale. Because the property was held primarily for sale, it was not eligible for tax-deferred treatment under the tax code, regardless of any action or inaction by Taylor.

¶12.    The relevant portion of Section 1031(a) of the tax code provides:

(a) Nonrecognition of gain or loss from exchanges solely in kind.

(1) In general. No gain or loss shall be recognized on the exchange of property held for productive use in a trade or business or for investment if such property is exchanged solely for property of like kind which is to be held either for productive use in a trade or business or for investment.

(2) Exception. This subsection shall not apply to any exchange of–

(A) stock in trade or other property held primarily for sale[.]

26 U.S.C.S. § 1031.

¶13.    The exception stated in Section 1031(a)(2)(A) clearly excludes property held primarily for sale from tax-deferred treatment under Section 1031. Per this section, the owner of property held primarily for sale cannot use that property in a Section 1031 exchange and qualify for tax-exempt status. The question at issue is whether Callicutt held the Moore property primarily for sale  so that the property could not have qualified for tax-deferred

6

status regardless of action of inaction by Taylor. Furthermore, as Callicutt is a real-estate dealer, he has the burden of proving that "when (he) dealt with the parcels of land (involved herein) (he) was wearing the hat of an investor rather than that of a dealer." *Land Dynamics v. Comm'r*, T.C.M. 259 (1978) (citing *Pritchett v. Comm'r*, 63 T.C. 149, 164 (1974)).

¶14. In his deposition, Callicutt admits that his original intent was to hold the property for sale:

> Q. When did you – let me ask it this way: When you purchased Moore Farms, was it your intention to resell that property at the time that your purchased it?

> A. It – it was not my intention to resell it as a whole. *It was my intention to resell it one piece at a time*.

(Emphasis added).

¶15. After his deposition, it also came to light that Callicutt had entered into a contract to sell the land as a whole to Hurdle prior to his closing with Moore. Thus, the moment Callicutt acquired title to the Moore property, he immediately was contractually obliged to sell the property.

¶16. Normally, the question of whether property is held primarily for sale is a question of the taxpayer's intent, which in turn is a question of fact. *Beeler v. Comm'r*, T.C.M.73 (1997) (citing *Verito v. Comm'r*, 43 T.C. 429, 441-42 (1965)). Callicutt argues that as a question of fact, it is reserved for the jury. However, the mere presence of a factual question does not automatically preclude summary judgment, as the party opposing the motion for summary judgment is required to set forth specific facts showing that genuine issues for trial do exist.

7

*See **Richardson v. Norfolk & Southern Ry.**, 923 So. 2d 1002, 1007 (Miss. 2006). Callicutt filed an affidavit on February 26, 2006, after the briefs and the supplemental briefs for summary judgment were filed, asserting that it was not his intention to sell the property. The affidavit contradicted his earlier deposition testimony, as well as the contract to sell the land that he entered into with Hurdle. While the Court normally must resolve all factual inferences in favor of the nonmovant, "the nonmovant cannot manufacture a disputed material fact where none exists. Thus, the nonmovant cannot defeat a motion for summary judgment by submitting an affidavit which directly contradicts, without explanation, his previous testimony." **Foldes v. Hancock Bank**, 554 So. 2d 319, 321 (Miss. 1989) (citations omitted).

¶17. Given Callicutt's previous testimony and the agreement he signed prior to taking ownership of the property, there can be little doubt about his intent when he acquired the property. The trial court correctly held that he was unable to met his burden of showing the existence of any material fact for a jury with respect to the tax liability he claimed as damages. The tax court made a similar finding in **Griffin v. Commissioner**, 49 T.C. 253, 260 (1967), when it found that a Missouri property was held for sale and could not have been held for any other purpose because, prior to acquisition of the property, the petitioner had executed a binding contract to sell the property. **Griffin**, 49 T.C. at 260. Both Callicutt's decision to purchase the Moore property and his decision to enter into a contract to sell that property occurred before any consultation with Taylor. Accordingly, no action or inaction

8

by Taylor resulted in the failure of the property to qualify for a Section 1031 exchange, and thus the tax damages claim of $478,803 properly was dismissed as a matter of law.

### B. Lost Future Income.

¶18. Callicutt further claims damages of $1,079,791.11 for lost future lease income on a piece of property he was allegedly forced to sell in order to pay the taxes on the failed Section 1031 exchange. He alleges these damages were a direct consequence of the $478,803 tax liability Callicutt was forced to pay. As previously discussed, these taxes were not damages resulting from any action or inaction of Taylor. Callicutt held the property primarily for sale, and therefore, the transaction could not have qualified for Section 1031, tax-deferred treatment under any circumstances. Therefore, Taylor cannot be held liable for any actions that Callicutt was forced to take to pay taxes for which he would have been responsible with or without any involvement by Taylor. As a matter of law, the lost future profits were not the result of any conduct on the part of Taylor, and thus, summary judgment was appropriate.

### C. and D. Tax Penalties and Interest and Cost of Borrowing Money.

¶19. Callicutt also claims damages of $18,992.89 in penalties and interest as a result of the taxes he was unable to defer, as well as damages of $13,943 incurred when he had to borrow money to pay the taxes due on the property sale. Callicutt would have owed the taxes regardless of any alleged injurious conduct of Taylor. However, Callicutt claims that his damages included penalties and interest incurred by the delay in his payment of those taxes

and damages for having to borrow money to pay the taxes due on the property. Clearly, the property never qualified for a Section 1031 exchange. The property was disqualified for a like-kind exchange before Callicutt ever had any dealings with Taylor. Furthermore, to the extent that Callicutt may have had to incur costs to borrow money to pay the taxes for the Moore property, Taylor's actions or inactions had no bearing on the liquidity of Callicutt's assets to pay his tax liability for the Moore property. Despite the failure of the Moore property to qualify as a Section 1031, like-kind exchange, the issue of these incidental damages will be discussed more fully under the following fiduciary-duty issue.

> **II.     Did the lower court err in finding that no issue of fact existed with regard to the duty owed Callicutt by Taylor?**

¶20.    Callicutt contends that Taylor owed a fiduciary duty to him and that Taylor's breach of her alleged fiduciary duty caused him to incur damages. As previously discussed in Issue I, this Court held that, prior to any involvement by Taylor, Callicutt's action caused the Moore property to be disqualified as a Section 1031, like-kind exchange. The failed Section 1031 exchange imposed a tax liability on Callicutt. Therefore, Callicutt had no basis to recover damages for the tax liability incurred by the sale of the Moore property, the alleged lost profits, or costs of borrowing money to  pay the tax liability.

¶21.    To find Taylor liable for alleged damages for penalties and interest for late payment and expenses for causing his need to borrow money to pay the taxes, Callicutt must show: (1) Taylor owed him a duty; (2) Taylor breached that duty; and (3) Taylor's breach of that

duty was the cause of the alleged damages. *Holliday v. Pizza Inn*, 659 So. 2d 860, 864 (Miss. 1995).

¶22.    In granting summary judgment, the trial court found that there was no issue of material fact as to the existence of such a duty.  Callicutt alleges that Taylor undertook fiduciary duties by giving legal and accounting advice to him in connection with the structuring of the failed Section 1031 exchange, and the resulting damages were the product of Callicutt's justifiable reliance on Taylor's representations.  In response, Taylor contends that the trial court properly found that Taylor owed Callicutt no duty, fiduciary or otherwise, in connection with the failed Section 1031 exchange.

¶23.    In *Lowery v. Guaranty Bank & Trust Co.*, 592 So. 2d 79, 83 (Miss. 1991), this Court held:

> A fiduciary duty must exist before a breach of the duty can occur.  "Fiduciary relationship" is a very broad term embracing both technical fiduciary relations and those informal relations which exist wherever one person trusts in or relies upon another.  Black's Law Dictionary 564 (5th Ed. 1979).  A fiduciary relationship may arise in a legal, moral, domestic, or personal context, where there appears "on the one side an overmastering influence or, on the other, weakness, dependence, or trust, justifiably reposed." *Miner v. Bertasi*, 530 So. 2d 168, 170 (Miss. 1988); *Matter of Estate of Haney*, 516 So. 2d 1359 (Miss. 1987).

*Lowery*, 592 So. 2d at 83.  In *Hopewell Enterprises, Inc. v. Trustmark National Bank*, 680 So. 2d 812, 816 (Miss. 1996), this Court held:

> Whenever there is a relationship between two people in which one person is in a position to exercise a dominant influence upon the other because of the latter's dependency upon the former, arising either from weakness of mind or body, or through trust, the law does not hesitate to characterize such relationship as fiduciary in character.

11

*Hopewell*, 680 So. 2d at 816; *Collums v. Union Planters Bank, N.A.*, 832 So. 2d 572, 578 (Miss. Ct. App. 2002).

¶24. No issue of genuine fact exists as to Taylor's alleged fiduciary duty to Callicutt. Callicutt never qualified for a Section 1031 exchange, and Taylor's dealings with Callicutt clearly were not fiduciary in nature. Therefore, Callicutt's request for damages allegedly attributable to Taylor's breach of duty is without merit.

¶25. The trial court found that no fiduciary relationship existed between Taylor and Callicutt. The trial court reasoned that there was no evidence that Taylor had any dominion or control over Callicutt. In addition, the trial court also found no evidence that the Section 1031 exchange was a common interest or that Taylor profited from the exchange.

¶26. Callicutt fails to demonstrate that he had a fiduciary relationship with Taylor. Callicutt bought the Moore property from Dudley Moore for $2.6 million in February 2003. Prior to the closing on the Moore property, Callicutt had a contract with Hurdle to buy the Moore property for $3.8 million. As the trial court correctly determined, Callicutt was disqualified from performing a Section 1031 exchange because he held the property primarily for sale. Therefore, the $1.2 million profit that resulted from the sale of the Moore property by Callicutt to Hurdle was subject to taxation and not eligible for a tax deferment.

¶27. Furthermore, there is no evidence of Taylor's dominion or control over Callicutt. Callicutt had closed on the Moore property with Dudley and had contracted to sell the Moore property to Hurdle, thus disqualifying the property for any Section 1031 exchange, prior to having any communications with Taylor. Before the April 10, 2003, closing between

12

Callicutt and Hurdle, Callicutt saw Taylor to inquire about a Section 1031 exchange of property. Taylor was hired by the Bank of Holly Springs, not Callicutt, to perform the closing on behalf of Hurdle. Callicutt testified that he did not know who hired Taylor to perform title work and the closing. Taylor's title company performed only title searches and loan closings. Taylor was not an attorney, nor was she an accountant. In addition, neither Taylor nor her business held themselves out to be experts in tax law or in Section 1031 exchanges.

¶28. Taylor printed Section 1031 information that she received at a seminar and a sample copy of an agreement for Callicutt. Callicutt testified in his deposition that Taylor never told him how much money he would have to place in an escrow account for a like-kind property exchange pursuant to Section 1031. He also stated that Taylor copied some documents concerning Section 1031 exchanges and explained the process. However, Callicutt did not remember any specific information that Taylor told him in regard to the Section 1031 exchange. Taylor testified that she informed Callicutt that he would need to consult an attorney or certified public accountant regarding a Section 1031 exchange.

¶29. Callicutt executed an exchange agreement between himself and Union Planters. He testified that he assumed that Union Planters had prepared the Section 1031 exchange agreement. Callicutt bought $1.2 million in other property following the Hurdle closing. However, Callicutt never informed Taylor of the purchase of replacement property. In fact, Callicutt and Taylor had no subsequent dealings with each other after the Hurdle closing.

13

Instead, Callicutt worked with Union Planters on the acquisition of $1.2 million in real property.

¶30. Callicutt contends that Taylor prepared the exchange agreement for a fee of $1,000 for legal services. The settlement statement for the closing of the sale of the Moore property from Callicutt to Hurdle provides that $1,000 was paid for "Attorney's Fee for preparation of Exchange Agreement & Supporting affidavits." The settlement statement also provides that Callicutt and Hurdle each paid $500 to Taylor's employee, Jennifer Shackleford, for the closing. Callicutt argues that Taylor received a $1,000 fee for preparing the exchange agreement. As the settlement document reflects, Callicutt's characterization of the fee payment is incorrect and inconsistent with notations of other fees charged by Taylor's business, Professional Services. The settlement statement does not reflect that either Taylor or Professional Services received the $1,000 for preparation of the exchange agreement.

¶31. Accordingly, the trial court correctly determined that Taylor owed no fiduciary duty to Callicutt. Since Taylor did not owe any duty to Callicutt, there was no breach of duty to result in any damages to him. This issue is without merit.

## CONCLUSION

¶32. For the foregoing reasons, the judgment of the Circuit Court of Marshall County is affirmed.

¶33. **AFFIRMED.**

**SMITH, C.J., WALLER, P.J., CARLSON, RANDOLPH AND LAMAR, JJ., CONCUR. DIAZ, P.J., CONCURS IN PART AND DISSENTS IN PART WITH**

14

**SEPARATE WRITTEN OPINION JOINED BY GRAVES, J. DICKINSON, J., JOINS IN PART.**

**DIAZ, PRESIDING JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶34. While I agree with the majority that the trial court correctly granted summary judgment on Callicutt's claims for tax and future-profit damages, I do not share the majority's view that the trial court properly granted summary judgment with respect to (1) whether Taylor owed Callicutt a duty and (2) whether her alleged breach of a duty was the direct and proximate cause of the accrual of penalties and interest in connection with Callicutt's delay in paying the taxes on the sale of the Moore property, as well as the cost of borrowing money to pay those taxes. Looking at the evidence in the light most favorable to Callicutt, I conclude that there was a genuine issue as to whether an informal fiduciary relationship existed between Taylor and Callicutt and whether Taylor's alleged breach of that duty was the direct and proximate cause of Callicutt's incidental tax damages.

¶35. Callicutt alleges that Taylor owed him a fiduciary duty because she gave him legal and accounting advice about the structuring of a like-kind exchange, arranged the like-kind exchange with Union Planters as the qualified intermediary and helped execute the exchange between him and Union Planters. In response, Taylor contends that the trial court properly found that Taylor owed Callicutt no duty, fiduciary or otherwise, in connection with the failed like-kind exchange.

15

¶36.    The term "fiduciary relationship" is a "broad term embracing both technical fiduciary relations and those informal relations which exist wherever one person trusts in or relies upon another." *Lowery v. Guaranty Bank & Trust Co.,* 592 So. 2d 79, 83 (Miss. 1991) (citation omitted). "A fiduciary relationship may arise in a legal, moral, domestic, or personal context where there appears on the one side an overmastering influence or, on the other, weakness, dependence, or trust, justifiably reposed." *Id.* (internal quotation marks and citations omitted). The existence of a fiduciary duty is a question of fact. *Id.* at 85. "[O]ur law applies a broad brush to this doctrine and does not preclude a jury's finding of a fiduciary relationship in [particular] situations." *Robley v. Blue Cross/Blue Shield*, 935 So. 2d 990, 994 (¶10) (Miss. 2006) (citation omitted).

¶37.    Examining the evidence in the light most favorable to Callicutt, I find that a genuine issue exists as to whether Taylor owed Callicutt an informal fiduciary duty. *Noxubee County Sch. Dist. v. United Nat'l Ins. Co.*, 883 So. 2d 1159, 1163 (¶6) (Miss. 2004) (citations omitted). According to Callicutt, Taylor represented that she had the requisite sophistication and knowledge to arrange a valid, like-kind exchange and would assist him in executing such an exchange with Union Planters acting as the qualified intermediary.[2] Callicutt claims that, based on those representations made by Taylor, he relied on her to arrange and guide him through a like-kind exchange in connection with the sale of the Moore

---

[2]In the affidavit he filed on February 26, 2006, Callicutt stated that he "asked for advice from Diane Taylor regarding whether or not [he] could structure the sale so as to defer the taxes and she told [him] that [he] could and that she had handled such transactions before with Union Planters."

16

property to Hurdle.[3]  It is undisputed that Callicutt paid Taylor a $1,000 "Attorney's Fee" to prepare the exchange agreement and that Taylor prepared the exchange agreement.[4]

¶38.    In Taylor's account of the events leading up to the botched like-kind exchange, she merely suggested to Callicutt that a like-kind exchange might be one way to avoid taxes; provided him with some materials she had concerning like-kind exchanges; including contact information for companies she suggested he contact that specialized in like-kind exchanges; and advised him to contact a tax attorney and a CPA.  Taylor denies that any discussion of using Union Planters as a qualified intermediary occurred until the day of the closing, claiming instead that Callicutt asked her to structure the transaction as a like-kind exchange at the closing.

¶39.    "Issues of fact sufficient to require denial of a motion for summary judgment obviously are present where one party swears to one version of the matter in issue and

---

[3]Callicutt claimed in the affidavit that he "had never been involved in a like kind [sic] exchange and [he] relied on . . . Taylor . . . to advise [him] concerning the transaction."  In his mind, he "was paying . . . Taylor to guide [him] with regard to the like kind [sic] exchange."

[4]The majority claims that the settlement statement "does not reflect that either Taylor or Professional Services received the $1,000 for preparation of the exchange agreement." I do not see how the majority comes to this conclusion when the settlement statement clearly shows that Callicutt paid Taylor a $1,000 "Attorney's Fee for preparation of Exchange Agreement & Supporting affidavits" and Taylor does not argue that the $1,000 fee was not paid by Callicutt.  It is not clear why Taylor charged an "Attorney's Fee" for preparing the exchange agreement between Callicutt and Union Planters.  She is not an attorney and does not pretend to provide legal services.  However, the labeling of the $1,000 fee as an "Attorney's Fee" suggests that she considered  herself to possess expertise comparable to that of an attorney in arranging like-kind exchanges, which bolsters Callicutt's argument for the existence of a fiduciary duty.

17

another says the opposite." ***Daniels v. GNB, Inc.***, 629 So. 2d 595, 599 (Miss. 1993). Because each party swears to a different set of material facts, summary judgment was improperly granted. The majority, however, contends that Callicutt presented "no evidence that Taylor had any dominion or control over [him]." Although I agree no evidence of Taylor's dominion or control over Callicutt exists, I conclude, viewing the evidence in the light most favorable to Callicutt, that a reasonable jury could find the existence of a "dependence, or trust, justifiably reposed" by Callicutt in Taylor. ***Lowery***, 592 So. 2d at 83. A jury could find the existence of a fiduciary relationship in this case based on Taylor's alleged representations about her ability to arrange a valid, like-kind exchange, her alleged arrangement of the exchange between Callicutt and Union Planters, Callicutt's alleged reliance on Taylor to arrange a valid like-kind exchange and his payment of the $1,000 "Attorney's Fee" to Taylor for the preparation of the exchange agreement.

¶40. I also conclude that the trial court improperly granted summary judgment on Callicutt's claim for $18,992.89 in penalties and interest that he was forced to pay as a result of the delay in paying his taxes on the sale of the Moore property, as well as his claim for the $13,943 he borrowed to pay those taxes. A genuine issue exists as to whether Taylor's alleged breach of her fiduciary duty caused him to delay paying the taxes on the sale of the Moore property, which resulted in the accrual of penalties and interest and required him to borrow money to pay the taxes.

¶41. I do agree with the majority that summary judgment was properly granted on Callicutt's claims for the $473,803 he paid in taxes on the sale of the Moore property and the

18

$1,079,791.11 of future lease income he allegedly lost on a piece of property he was allegedly forced to sell in order to pay the taxes on the sale of the Moore property. No action or inaction of Taylor resulted in the failure of the property to qualify for a like-kind exchange because Callicutt acquired the property from Moore with the intent of selling it. Callicutt would have incurred these costs regardless of any alleged wrongful conduct on the part of Taylor.

¶42. I would reverse the trial court's grant of summary judgment on whether Taylor owed Callicutt a fiduciary duty and Callicutt's claims for penalties and interest and the cost of borrowing money to pay the taxes, affirm the trial court's grant of summary judgment with respect to Callicutt's claims for the payment of the taxes and the lost lease income, and remand the case for further proceedings. Therefore, I respectfully concur in part and dissent in part.

**GRAVES, J. JOINS THIS OPINION. DICKINSON, J., JOINS THIS OPINION IN PART.**

19