# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2007-CA-00102-SCT

*LEROY CALVERT, JR.*

*v.*

*BRIAN D. GRIGGS AND TANYA N. GRIGGS*

| | |
|---|---|
| DATE OF JUDGMENT: | 12/18/2006 |
| TRIAL JUDGE: | HON. KENNETH M. BURNS |
| COURT FROM WHICH APPEALED: | CLAY COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | GARY STREET GOODWIN |
| ATTORNEYS FOR APPELLEES: | MICHELLE D. EASTERLING |
| | THOMAS B. STOREY, JR. |
| NATURE OF THE CASE: | CIVIL - REAL PROPERTY |
| DISPOSITION: | REVERSED AND REMANDED - 10/16/2008 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE WALLER, P.J., DICKINSON AND RANDOLPH, JJ.**

**WALLER, PRESIDING JUSTICE, FOR THE COURT:**

¶1.    This case involves a dispute between Bryan D. and Tanya N. Griggs and Leroy Calvert, Jr., over an easement which crosses the Griggses' property, which is Calvert's only means of access to a public road. The Griggses constructed a fence along this easement and planned eventually to install gates at each end. After Calvert destroyed portions of their fence, the Griggses filed suit seeking declaratory and injunctive relief. Calvert asserted a counterclaim to enjoin the Griggses from constructing a fence and to require them to remove any existing fencing as well as other improvements. The chancery court granted summary

judgment to the Griggses. The court found that the Griggses could erect fences and gates, so long as Calvert was given keys to any locks. Calvert was enjoined from any further interference, and was assessed $11,396 in damages. Because we find genuine issues of material fact exist concerning the reasonableness and necessity of the Griggses' fence and gates, we reverse and remand.

**FACTS**

¶2. Leroy Calvert bought a residential parcel of property with no frontage near Hamlin Road in West Point, Mississippi. His deed contained an express easement, forty feet wide, which ran from his property, across the property of Bryan and Tanya Griggs, to Hamlin Road.[1] The Griggses' deed contained an express easement, as well.[2]

¶3. After his purchase, Calvert began building a house on the property. During this time, the Griggses began constructing a barbed-wire fence around their property. This fence ran the length of the easement and, according to Calvert, crossed it and "blocked" access to his house. The Griggses left a gap in the fence so that he could access his property. On two occasions, the fence prevented a "big truck" from accessing his property during the

---

[1] The record includes no map of the land or easement. It appears that Hamlin Road runs north and south, and the Griggses' property is on the western side of the road. Calvert's property is separated from Hamlin road by two properties, one of which is the Griggses' property. The Griggses' property is burdened with an easement that gives Calvert access to the road. Other than this easement, Calvert's property is landlocked.

[2] Unfortunately, the deeds do not appear in the record. Calvert includes them in his record excerpts, but there are no corresponding documents in the record itself. The same is true of letters written by the descendants of the grantor of the easement. These documents were the subject of a motion to supplement the record filed by Calvert, which was denied without prejudice for failure to attach certified copies of the proposed records. The Griggses' complaint, however, includes a description of their property along with the easement. This language appears to have been taken directly from the Griggses' deed.

2

construction of his home. Aside from these two occasions, Calvert maintained access to his property via the easement.

¶4. The Griggses also intended to install gates at both ends of the easement, one at Hamlin Road and one at the boundary of Calvert's property. Calvert would be given keys to these gates. Calvert saw this as an attempt to "box" or "block in" the easement, and interfere with his right of passage.

¶5. After the Griggses erected the fence, Calvert cut the barbed wire and removed some of the fence posts along the easement. When the Griggses replaced the fencing, Calvert damaged it as well. Prior to the commencement of this action, no gates had been erected.

¶6. On April 15, 2005, the Griggses filed a complaint for injunctive relief, damages, and a declaratory judgment. They sought (1) to enjoin Calvert from destroying the fence they had erected along their property line and his general easement, (2) to recover damages for Calvert's destruction of the fence, and (3) declaratory relief as to each parties' rights concerning the easement. Calvert filed a counterclaim to enjoin the Griggses from constructing the fence across his easement and to have them remove a gazebo and shrubbery which allegedly interfered with his use of the easement. The Griggses filed a motion for summary judgment.

¶7. Following a hearing, the chancellor granted summary judgment to the Griggses. The chancellor awarded $11,396.23 in damages to the Griggses and issued a declaratory judgment granting the Griggses permission to erect fences and gates at either end of the easement, conditioned on their furnishing Calvert with keys to any locks. The chancellor enjoined Calvert (1) to keep the gates closed and locked except when he accessed his

3

property, (2) to keep vehicles or equipment from parking on the easement, and (3) to maintain the surface road on the easement. Several months later, the Griggses filed a second motion for summary judgment on Calvert's counterclaim, and moved for final judgment under Rule 54 of the Mississippi Rules of Civil Procedure. The chancellor granted the Griggses' second motion for summary judgment, and dismissed Calvert's counterclaim.

¶8.     Calvert now appeals, raising one assignment of error: whether the chancellor erred in awarding summary judgment to the Griggses. The Griggses, however, contend that Calvert's appeal is untimely.

## DISCUSSION

**I.      Whether Calvert's appeal is untimely.**

¶9.     A timely-filed notice of appeal is a jurisdictional prerequisite to invoking this Court's review, and we review jurisdictional matters de novo. *Busby v. Anderson*, 978 So. 2d 637, 638-39 (Miss. 2008) (citing *Miss. Dep't of Mental Health v. Hall*, 936 So. 2d 917, 929 (Miss. 2006)); *RAS Family Partners, LP v. Onman Biloxi, LLC*, 968 So. 2d 926 (Miss. 2007)). The Griggses argue that Calvert's appeal from the summary judgment order entered on June 21, 2006, is untimely. We find this issue to be without merit.

¶10.    An appeal to this Court may be taken as a matter of right only after the trial court disposes of all the claims against all defendants. Miss. R. Civ. P. 54(b); *Briscoe's Foodland, Inc. v. Capital Associates, Inc.*, 502 So. 2d 619, 622 (Miss. 1986). "Absent certification under Rule 54(b), any order in a multiple party or multiple claim action, even if it appears to adjudicate a separable portion of the controversy, is interlocutory." Miss. R. Civ. P. 54 cmt. At the hearing on the Griggses' first motion for summary judgment, the chancellor

4

reserved ruling on the counterclaim. After the chancellor granted the Griggses' first motion for summary judgment, they filed a second motion for summary judgment on Calvert's counterclaim and sought certification of a final judgment. The chancellor's December 18, 2006, order subsequently disposed of Calvert's counterclaim. Notably, the December 18 order also stated that "[t]he [s]ummary [j]udgment of this court dated June 21, 2006, is hereby made the final judgment of this court under Rule 54 MRCP . . . ." When a trial court certifies a claim for appeal under Rule 54(b), the time for taking the appeal begins to run on the date of certification. 10 C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 2661, at 128 (2d ed. 1983). Therefore, we find that the chancellor's December 18 order constituted the final, appealable judgment. Because Calvert's appeal was filed within thirty days of this December 18 order, we find his appeal to be timely.

## II. Whether the chancellor erred in awarding summary judgment to the Griggses.

¶11. This Court reviews a trial court's grant of summary judgment de novo. ***Callicutt v. Prof'l Servs. of Potts Camp, Inc.***, 974 So. 2d 216, 219 (Miss. 2007). In evaluating a grant of summary judgment, we consider all evidentiary matters, including admissions in pleadings, answers to interrogatories, depositions, admissions, and affidavits. ***Glover v. Jackson State University***, 968 So. 2d 1267, 1275 (Miss. 2007) (citing Miss. R. Civ. P. 56 (c)). This evidence must be viewed in the light most favorable to the non-moving party. ***Simpson v. Boyd***, 880 So. 2d 1047, 1050 (Miss. 2004) (quoting ***Palmer v. Anderson Infirmary Benevolent Ass'n***, 656 So. 2d 790, 794 (Miss. 1995)). The existence of a genuine issue of material fact will preclude summary judgment. ***Massey v. Tingle***, 867 So. 2d 235,

5

238 (Miss. 2004). A fact is material if it "tends to resolve any of the issues properly raised by the parties." *Simpson*, 880 So. 2d at 1050 (quoting *Palmer*, 656 So. 2d at 794). The motion "should be overruled unless the trial court finds, beyond a reasonable doubt, that the plaintiff would be unable to prove any facts to support his claim." *Simpson*, 880 So. 2d at 1050 (quoting *Palmer*, 656 So. 2d at 796).

¶12. Calvert argues that there are genuine issues of material fact concerning the intention of the parties who created the easement, as well as the reasonableness of the Griggses fence and any future improvements. He further submits that the chancellor failed to apply the correct legal standard in awarding summary judgment to the Griggses.

¶13. Where an easement is silent, we consider the surrounding circumstances to determine the intent of the grantor and grantee. *Rowell v. Turnage*, 618 So. 2d 81, 86 (Miss. 1993). Unless the creators' intent indicates otherwise, the owner of a servient estate "may erect gates or bars across a way provided they are so located, constructed, and maintained as not unreasonably to interfere with the right of passage and they are necessary for the preservation and use of the servient estate." *Rowell*, 618 So. 2d at 86 (quoting 28 C.J.S. *Easement* § 98 at 781 (1941)).

¶14. This case is somewhat unique because the Griggses sought a declaratory judgment as to their rights with respect to the easement, and more specifically whether they could erect a fence and gates. *Cf. Rowell*, 618 So. 2d at 82, 87 (The dominant landowner sought injunction to prohibit servient landowner from interfering with his enjoyment and use of easement. The burden was on dominant estate holder to show that the servient estate owner's gates unreasonably interfered with his use of the easement.). By filing for a declaratory

6

judgment and an injunction, the Griggses assumed the burden of proof. Thus, the Griggses must prove either that: (1) the original executors intended to allow the servient estate to erect gates and fences around or alongside the easement; *or* (2) the original executors intent is undeterminable, but the erection of the fence or gates does not unreasonably interfere with Calvert's right of passage and is necessary for the preservation and use of the Griggses' property. *See* **Rowell**, 618 So. 2d at 87 (quoting 28 C.J.S. *Easement* § 98 at 781 (1941)).

### A. The original intent of the grantor and grantee.

¶15.  Intent is a question of fact, and is "shown by the circumstances of the case, the nature and situation of the property subject to the easement, and the manner in which the [easement] has been used and occupied." **Rowell**, 618 So. 2d at 86 (quoting 25 Am. Jur. 2d *Easements* § 91 (1966)). Where there is any doubt or ambiguity concerning the intention of the parties to the creation of an easement, the language granting the easement will be construed against the grantor. **Boggs v. Eaton**, 379 So. 2d 520, 522 (Miss. 1980); **Ouber v. Campbell**, 202 So. 2d 638, 641 (Miss. 1967).

¶16.  The record is almost completely silent with respect to the grantor and grantee's intent concerning fencing or gates. The easement itself describes only metes and bounds. The little evidence concerning the parties' intent deals with the status of the two estates at the time the easement was created and the prior use of the easement. At the time of its creation, the easement was unencumbered by any fence or gates. It is also unclear whether any surface road existed at that time. It appears there was no residence on Calvert's land prior to his decision to build a home there.

¶17. We find that the Griggses failed to meet their burden of proving that the original creators intended to allow the servient estate to erect fencing and gates on or alongside the easement. Yet, because we cannot determine that the creators sought to preclude such actions, we must further consider whether the Griggses established that the fencing and/or gates did not unreasonably interfere with Calvert's right of passage, and are necessary for the preservation and use of their property. *See Rowell*, 618 So. 2d at 86 (quoting 28 C.J.S. *Easement* § 98 at 781 (1941)).

> **B.    Whether the fencing and/or gates unreasonably interfere with Calvert's right of passage and are necessary for the preservation and use of the Griggses' property.**

¶18. Calvert submits that the Griggses' improvements unreasonably interfere with his right of passage. On two occasions, the fence blocked a "big truck" from accessing his property during the construction of his home. Additionally, if gates are installed, Calvert asserts that he would be required to (1) enter his driveway; (2) exit his vehicle and open the first gate; (3) return to his vehicle and drive through this gate; (4) exit his vehicle once again and close the gate; and (5) return to his vehicle, drive to the second gate, and start the process all over again.

¶19. We have held that a locked gate does not unreasonably interfere with the right of passage to an easement. *Rowell*, 618 So. 2d at 86; *see also Lindsey v. Shaw*, 210 Miss. 333, 337-38, 49 So. 2d 580, 583 (1950); *Bd. of Trustees of Univ. of Miss. v. Gotten*, 119 Miss. 246, 80 So. 522 (1919). In *Gotten*, the plaintiff sought to enjoin the University of Mississippi from erecting a gate across the only road that afforded him ingress and egress to his property. *Gotten*, 119 Miss. at 253. This Court affirmed the right of the university to

8

maintain the gate.  *Id*. at 256.  The Court cited approvingly the following language from

***Kohler v. Smith***, 3 Pa. Super. 176, 180 (1896):

> In the case before us there was no evidence that the gate, erected by the defendant was a practical hindrance, nor that it was, under the circumstances, an unreasonable obstruction to the plaintiff's use of the right of way across the defendant's uninclosed field. *There is some evidence on the part of the plaintiff that it was an inconvenience to open the gate, but his explanation shows that it was only the usual and necessary inconvenience which was caused by descending from his wagon, opening the gate, driving through it, and closing it again. This we think, under all the authorities, cannot be considered in any sense as an unreasonable obstruction nor a hindrance to the free use of the way by the owner of the easement.* The court below was therefore correct in that part of the charge to the jury which is complained of; and, as this is the only assignment of error, the judgment is affirmed.

***Gotten***, 119 Miss. at 255-56 (quoting ***Kohler***, 3 Pa. Super. at 180) (emphasis added).

¶20.    Based on the totality of the circumstances, we find the case before us distinguishable. Calvert would be required to proceed through not just one, but two gates, in order to access his own residence.  Reasonable persons could differ as to whether this constitutes an unreasonable interference with a homeowner's right of passage, and therefore, this question is best left to the trier of fact.  ***Rowell***, in which we affirmed a chancellor's ruling that three gates did not impose an unreasonable restriction, is also distinguishable.  ***Rowell***, 618 So. 2d at 82, 86-87.  In ***Rowell***, the dominant owner purchased the property with knowledge of the servient owner's existing gates and cattle operation.  ***Id***. at 84.

¶21.    We further find a genuine issue of material fact exists as to whether the fencing and gates are necessary for the preservation and use of the Griggses' property.  The Griggses have a horse and have indicated that the fence was necessary to keep neighbors' cattle from roaming onto their property.  Yet the timing and circumstances surrounding the Griggses'

9

improvements raise some questions. The Griggses did not erect the fence until almost four years after their purchase of the servient estate, and right at the time Calvert began building his home. Even then, no gates were were installed. Considering these circumstances and the vagueness of the notion of roaming cattle, we find that this issue merits further development.

¶22. Because we find that genuine issues of material fact remain, we find that the trial court erred in its award of declaratory relief on summary judgment.

CONCLUSION

¶23. We find that genuine issues of material fact exist as to whether the fencing and/or gates unreasonably interfere with Calvert's right of passage, and whether such obstructions are necessary for the use and preservation of the Griggses' estate. Because the damages and injunction against Calvert are inextricably dependent upon the parties' respective legal rights, we reverse and remand this matter for a trial on the merits.

¶24. **REVERSED AND REMANDED.**

**SMITH, C.J., DIAZ, P.J., CARLSON, GRAVES, DICKINSON AND LAMAR, JJ., CONCUR. RANDOLPH, J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY SMITH, C.J., WALLER, P.J., CARLSON AND DICKINSON, JJ. EASLEY, J., NOT PARTICIPATING.**

**RANDOLPH, JUSTICE, SPECIALLY CONCURRING:**

¶25. I concur with the analysis of the majority and write separately only to further address Issue II.(B.), namely, "[w]hether the fencing and/or gates unreasonably interfere with Calvert's right of passage . . . ." (Majority Opinion at paragraph 18).

¶26. I agree with the majority that in the case *sub judice*, "[r]easonable persons could differ as to whether this constitutes an unreasonable interference with a homeowner's right of

passage, and therefore, this question is best left to the trier of fact." (Majority Opinion at paragraph 20). The majority notes that the 1919 *Gotten* case cited language from the 1896 *Kohler* case which stated, in part, that:

> [t]here is some evidence on the part of the plaintiff that it was an inconvenience to open the gate, but his explanation shows that it was only the usual and necessary inconvenience which was caused by descending from his *wagon*, opening the gate, driving through it, and closing it again.

*Bd. of Trustees of Univ. of Miss. v. Gotten*, 119 Miss. 246, 255, 80 So. 522 (1919) (quoting *Kohler v. Smith*, 3 Pa. Super. 176, 180 (1896)) (emphasis added). The language in *Kohler* reflects how times have changed, and accordingly the legal concept of unreasonable interference must evolve therewith. The days of horses and wagons have long since passed. What was not an "unreasonable interference" in 1896 might be so deemed today.

¶27.   As pertinently stated by Benjamin Cardozo, "[p]recedents drawn from the days of travel by stage coach do not fit the conditions of travel to-day. The principle . . . does not change, but the things subject to the principle do change. They are whatever the needs of life in a developing civilization requires them to be." *MacPherson v. Buick Motor Co.*, 217 N.Y. 382, 111 N.E. 1050, 1053 (1916). *See also* Roscoe Pound, *Interpretation of Legal History* 1 (1923) (in evaluating developments in society, courts "must seek principles of change no less than principles of stability."). In 1896, there were no meter readers for electricity,[3] and no electric pumps to furnish water. Moreover, package deliveries, repairs,

---

[3]In Clay County, the 4-County Electric Power Association, through a grant from the Works Project Administration, "became a distributor of TVA power and, on July 25, 1939, power was available to energize 700 miles of line to serve 1,224 consumer/members." 4-County Electric Power Association, http://www.4county.org (last visited Sept. 18, 2008).

11

and yard maintenance when no one was home were infrequent or non-existent. Therefore, the presence of locked gates, with keys solely provided to a homeowner,[4] may today be insufficient, and a locked gate may constitute unreasonable interference, depending on the circumstances.

¶28. On remand, the chancellor should apply the unreasonable interference principle to "whatever the needs of life in a developing civilization require them to be." *MacPherson*, 111 N.E. at 1053. In determining the necessity of a gate and how all parties may be accommodated, the chancellor should take into account available technological advances and modern conveniences.

**SMITH, C.J., WALLER, P.J., CARLSON AND DICKINSON, JJ., JOIN THIS OPINION.**

---

[4]Many of whom work at least several miles from home.

12